# HATTIE STADULSKI GARTNER v. JOHN J. GARTNER.[1]

February 10, 1956.

No. 36,614.

[1]Reported in 74 N. W. (2d) 809.

320

*Gallagher, Farrish, Sherman & Zimmerman,* for appellant.
*Johnson & Johnson,* for respondent.

MATSON, JUSTICE.

Appeal from an order denying plaintiff's motion for a new trial.

Plaintiff and defendant were married on June 5, 1948. Just prior to their marriage they entered into an antenuptial agreement, dated May 26, 1948, which purported to adjust their property rights upon their forthcoming marriage.

Plaintiff, on May 7, 1953, brought this action to have the antenuptial contract declared null and void on the grounds that: (1) It was contrary to public policy; (2) its terms are inadequate and unconscionable; (3) plaintiff did not understand its effect when she signed it; (4) defendant's procurement of plaintiff's signature thereto was a breach of a confidential and fiduciary relationship; and finally (5) it was the product of mutual mistake of the parties. Defendant in his answer, after making a general denial, affirmatively alleged that it was the intent of the parties that the agreement should become effective *only in the event of his death leaving the*

*plaintiff surviving him,* and that all provisions therein applicable to a termination of their marriage by legal proceedings were the result of mutual mistake and inadvertence.

The trial court, pursuant to a specific finding that the parties in entering into the antenuptial agreement did not intend that it should govern or apply in the event of divorce or other legal termination of their marriage but intended solely that it should control and limit the rights of each in the estate of the other only in case of the death of one or the other, ordered that the contract be reformed accordingly. The trial court concluded that the contract as reformed was adequate and reasonable, not contrary to public policy, and in full force and effect.

Prior to its reformation, paragraph 3 of the written instrument read:

"* * * This contract limits the right of either party to participate in the estate of the other, whether the marriage relation is determined by death *or legal proceedings.*" (Italics supplied.)

In two other paragraphs the instrument similarly referred to a determination of the marriage by legal proceedings. The instrument was reformed by deleting therefrom all language alluding to a termination of the marriage status by legal proceedings.

We have issues therefore as to whether, upon the evidence adduced, the court was justified in ordering a reformation of the contract and as to whether the contract as reformed was reasonable and valid as not being in contravention of public policy.

██ Plaintiff asserts that the evidence does not justify a reformation of the antenuptial agreement as written.

"* * * A written contract may be reformed where there has been an actual agreement between the parties and their minds have met on the terms which they intended the writing to express, and where the writing in fact fails to express those terms, and such failure was due to mutual mistake, or to mistake on one side and fraud or inequitable conduct on the other."[2]

[2]Barnum v. White, 128 Minn. 58, 61, 150 N. W. 227, 228, 151 N. W. 147; Johnson v. Giese, 231 Minn. 258, 42 N. W. (2d) 712.

The important point is that there was in fact a *valid agreement between the parties* and not that the *contract as drawn* was valid. Actually, where the parties have agreed to the terms of a contract and the scrivener has made a mistake in drawing the agreement, a court may reform the contract to make it conform to the intention of the parties. Mahoney v. Minnesota F. M. Ins. Co. 136 Minn. 34, 161 N. W. 217. It is well established that before a court may decree a reformation of a written contract on the ground of mutual mistake of the parties, or on the ground of a mistake of one party which is accompanied by the fraud or inequitable conduct of the other, the essential facts necessary to establish either of said grounds must be proved, not by a mere preponderance of the evidence, but by evidence which is clear, unequivocal, and convincing, although such evidentiary proof need not be so conclusive as to be beyond a reasonable doubt.[3]

In the light of these principles, does the evidence sustain a finding of mutual mistake? Defendant, who could not read or write, went to the office of an attorney, who on a few prior occasions had helped him with income tax matters, and asked if a contract could be drawn to govern his and plaintiff's property rights upon the death of either of them after their forthcoming marriage. No contract was then drawn but after defendant's departure the attorney prepared a preliminary draft based on a model taken from a form book. The next day both defendant and plaintiff appeared at his office. After some discussion of their respective property rights, the tentative draft was read to them. Plaintiff testified that she did not understand that the contract contained anything pertaining to divorce. She further said that she did not know the meaning of the phrase "whether the marriage relation is terminated by death or legal proceedings." Defendant testified that there was no talk or discussion about divorce, legal separation, or annulment prior to the execution of the contract and that he understood that the contract meant

---

[3]Fritz v. Fritz, 94 Minn. 264, 102 N. W. 705; Norman v. Kelso Farmers Mut. F. Ins. Co. 114 Minn. 49, 130 N. W. 13; Johnson v. Benham, 163 Minn. 31, 203 N. W. 444; Karger v. Wangerin, 230 Minn. 110, 40 N. W. (2d) 846; Johnson v. Giese, 231 Minn. 258, 42 N. W. (2d) 712.

"to take care of my property after I died." The attorney testified there was nothing said by either party while they were in his office as to what would happen to the property or what their rights would be if there was a divorce. As usual there is conflict in the testimony, but taking it as a whole we cannot say that it does not sustain the trial court's finding of mutual mistake by evidence that is clear, unequivocal, and convincing.

Was the contract as reformed valid? Antenuptial contracts in anticipation of marriage, fixing the rights which the survivor shall have in the property of the other after his or her death, are not against public policy but are regarded with favor as conducive to the welfare of the parties making them, and these contracts will be sustained whenever equitably and fairly made.[4] These contracts, when fairly and equitably made, exclude the operation of law in respect to the property rights of each insofar as these rights are covered by the contract.[5] An antenuptial contract, between parties standing in a fiduciary relation to each other,[6] is fairly and equitably made when its execution has been preceded by a fair and full disclosure and explanation of every material particular within the knowledge of the one who seeks to uphold it against the other;[7] and when it has not been procured: By an abuse of such fiduciary relations,[8] by undue influence or duress,[9] or for a consideration which under all the circumstances is so inadequate as to be unconscionable.[10] Where the parties stand in a confidential relation to

[4]In re Estate of Malchow, 143 Minn. 53, 172 N. W. 915; Appleby v. Appleby, 100 Minn. 408, 111 N. W. 305, 10 L.R.A.(N.S.) 590; Desnoyer v. Jordan, 27 Minn. 295, 7 N. W. 140; 9 Dunnell, Dig. (3 ed.) § 4285; 32 Minn. L. Rev. 278; see, M. S. A. 519.08.

[5]Appleby v. Appleby, supra.

[6]The relations of a man and woman betrothed to one another are presumably, but not invariably, confidential. See, In re Estate of Malchow, supra.

[7]In re Estate of Malchow, supra.

[8]Slingerland v. Slingerland, 115 Minn. 270, 132 N. W. 326.

[9]Slingerland v. Slingerland, supra; Welsh v. Welsh, 150 Minn. 23, 184 N. W. 38.

[10]Slingerland v. Slingerland, supra.

each other, and there is an absence or inadequacy of consideration, a presumption of fraud arises to cast upon the party seeking to uphold the contract the burden of showing that he procured the contractual benefits righteously.[11] Once confidence is reposed it must be preserved from any intermixture of imposition, and, once influence is acquired, it must be kept free from the taint of selfish interests and overreaching bargains. 1 Story, Equitable Jurisprudence, §§ 430, 431. "The outcome of actions of this character depends on the presence or absence of influence acquired and abused, or confidence reposed and betrayed." In re Estate of Malchow, 143 Minn. 53, 58, 172 N. W. 915, 917. It does not follow, however, that the requirement that the consideration must be adequate imposes upon a man about to marry an obligation to endow his prospective wife any proportion, due or otherwise, of all his property, under penalty, if he does not, of having his antenuptial contract with her decreed prima facie a fraud upon his part.[12]

In the light of the foregoing principles, we turn to a further consideration of the circumstances of the parties and the evidence bearing upon the procurement and execution of the contract. The antenuptial agreement, as reformed, provided that plaintiff, upon defendant's death, should receive the sum of $3,000 plus all household goods and furniture in full and final satisfaction of all her rights and claims in and to defendant's estate as his surviving widow, inclusive of all rights of inheritance, homestead, support, and otherwise. In the event plaintiff predeceased defendant, he was to receive one dollar in full satisfaction of any rights he would then have in her estate.

Plaintiff asserts that the evidence does not sustain the trial court's finding that the agreement was openly and honestly procured and that plaintiff was fully informed as to the effect of the agreement and as to the extent and nature of the defendant's property. Taking the evidence, as we must, in the light most favorable to the trial

---

[11]In re Estate of Malchow, 143 Minn. 53, 57 to 59, 172 N. W. 915, 916 to 917.

[12]In re Estate of Malchow, *supra;* Hosford v. Rowe, 41 Minn. 245, 42 N. W. 1018.

court's findings, we turn first to a consideration of the circumstances of the parties when the contract was made. At the time of their marriage in 1948, plaintiff was 54 years of age and defendant was 66. Defendant's first wife died in 1945 leaving nine children, who are of age and married. Plaintiff's first husband died in 1933. Three of her children by that marriage were living on the date of her marriage to the defendant. Prior to her marriage to the defendant, she received $50 per month from the welfare office of Blue Earth County for the support of herself and her children. She owned little or no property. Defendant, on the other hand, owned two farms comprised of 280 acres subject to a mortgage debt of $13,000. In addition, he owned a house in the village of Mapleton.

The evidence clearly sustains the court's finding that plaintiff was familiar with and had full knowledge of the extent and nature of defendant's property when the antenuptial agreement was made. Plaintiff and the defendant have been acquainted with each other for about 20 years prior to their marriage. Commencing with 1947 they had visited in each other's respective homes and this continued until their marriage. In fact, plaintiff had visited defendant's farms and his house in town on several occasions. Plaintiff herself testified that she not only knew that defendant's sons were on defendant's farms but that she had eaten meals at these places. The attorney who drew the antenuptial contract testified that both parties, when they met in his office, said they were acquainted with each other's property and that plaintiff had declared she wasn't interested in defendant's property. We can find no basis for holding that the trial court was not justified in finding that plaintiff knew the extent and nature of defendant's property.

The evidence also indicates that plaintiff was fully informed as to what her rights would be as a widow and as to the nature and effect of the antenuptial agreement with respect to those rights. Just prior to the execution of the agreement it was read and explained to both parties. Plaintiff was told by the attorney what her rights would be as a widow absent the agreement. She was not entirely inexperienced because some years before she had helped probate

her first husband's estate. We further can find no abuse by the defendant of the confidential relations existing between him and the plaintiff. A few days before the execution of the agreement, he discussed the matter with her. Just prior to the signing of the instrument, defendant stated frankly that he wanted his property to go to his sons because they had helped to accumulate it.

In view of the economic circumstances of the plaintiff and the defendant when the agreement was made, and in view of the claims that defendant's children justly had upon their father's property, we cannot say that the consideration to be paid to the plaintiff upon her husband's death was so inadequate as to be unconscionable or unjust.

There is no merit in the contention that the agreement is contrary to public policy. Where the parties to an agreement have executed a written instrument which through mutual mistake does not accurately reflect their actual and mutual understanding and a reformation of that written instrument to conform to their actual agreement has been decreed by the court, the validity of their contract as to whether it contravenes or conforms to public policy must be determined by the terms of the reformed instrument. Any other rule would defeat the purpose of contract reformation.

The order of the trial court is affirmed.

Affirmed.

MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.