GOLDEN VALLEY SHOPPING CENTER, INC. v. SUPER VALU
REALTY, INC., AND OTHERS.
SUPER VALU REALTY, INC. v. GOLDEN VALLEY
SHOPPING CENTER, INC., AND ANOTHER.

98 N. W. (2d) 55.

July 31, 1959—Nos. 37,653, 37,654.

*Leonard, Street & Deinard* and *Melvin H. Siegel,* for appellant.

*Kenneth M. Owen, Henry Halladay, Gregg Orwoll,* and *Dorsey, Owen, Scott, Barber & Marquart,* for respondents.

THOMAS GALLAGHER, JUSTICE.

Action by Golden Valley Shopping Center, Inc., hereafter referred to as Golden Valley, for a declaratory judgment that paragraph 17 of a lease between it as lessor and Super Valu Stores, Inc., which subsequently changed its name to Super Valu Realty, Inc., lessee, hereafter referred to as Super Valu, does not restrict or prohibit Golden Valley or any lessee thereof from constructing or operating a supermarket in the westerly portion of a shopping center owned by Golden Valley where no part thereof is to be within 500 feet of a supermarket therein leased to Super Valu.

Paragraph 17 of the lease provides:

"Lessor agrees that it will not lease or sublease any property in which it has an interest for use as a retail food or grocery store within a distance of 500 feet in any direction from demised premises. Lessee agrees not to franchise or license the operation of any Super Valu store within 500 feet of demised premises during the term of this Lease."

The demised premises described in the lease are located in the easterly portion of the shopping center and include "rights of ingress and egress and the joint use by Lessee, its agents, servants, customers and visitors with other tenants in said shopping center of driveways, parking areas, walks and other public areas."

Super Valu commenced a separate action against Golden Valley for a declaratory judgment that paragraph 17 of the lease prohibits construction of a second supermarket anywhere in the shopping center or within 500 feet thereof; or in the alternative for judgment reforming the lease to express such a restriction on the ground that it was omitted because of mutual mistake of the parties.

The actions were tried together. The trial court determined that because of mutual mistake paragraph 17 as above set forth did not express the true agreement which the parties intended to incorporate in the lease and ordered reformation thereof to express such agreement as follows:

"Lessor agrees that, during the term of this lease, it will not lease or sublease for use as a retail food or grocery store any part of the Golden Valley Shopping Center premises * * * or any property in which it may have or obtain an interest within a distance of five hundred (500) feet to the *north* or to the *east* of said shopping center premises. Lessee agrees not to franchise or license the operation of any Super Valu store within the area described immediately above during the term of this lease." (Italics supplied.)

From the judgments subsequently entered, this appeal is taken. On appeal Golden Valley contends that the evidence relating to the preliminary agreement, and to the negotiations leading to the incorporation of paragraph 17 in the lease, is not sufficiently clear, precise, and convincing to support a finding that because of mutual mistake paragraph 17 as included did not express the true agreement of the parties as found by the trial court, particularly since the rejection of a term of the preliminary offer of Super Valu in effect constituted a rejection of the entire offer so that the part not rejected could not form the basis of an agreement between the parties.

Golden Valley shopping center covers a triangular strip of land in

the village of Golden Valley, lying north and east of State Highway No. 55, south of the southerly line of Sixth Avenue North; and bordered on the east by Winnetka Avenue. Prior to and during 1953, before construction of Golden Valley shopping center had commenced, one Leonard R. Jensen owned and operated a Super Valu market on property belonging to him to the east of Winnetka Avenue, opposite the Golden Valley tract. He also owned property on the north side of Sixth Avenue North opposite such tract. His business had developed gross sales of over $1,000,000 per year, and he was contemplating the construction and operation of a shopping center on his premises to the north of Sixth Avenue North to which he intended to move his market. He had interested four other types of business as prospective lessees for portions of his property.

In January 1953 David B. Trach, president of Golden Valley, commenced negotiations with Jensen to induce him to lease space for a supermarket in Golden Valley's proposed shopping center. Jensen advised him of his plans to construct his own shopping center to the north of this tract. Trach pointed out the advantages of abandoning this plan and leasing premises for a supermarket in the Golden Valley shopping center to eliminate competition and to escape the obligation of financing and leasing his proposed center.

Jensen manifested interest in this, and negotiations continued between the parties until June 1953. In this month Jensen introduced Trach to representatives of Super Valu and of Winston and Newell Company, which owned the Super Valu chain of stores. Negotiations were thereafter continued between Trach and Jensen and such representatives. Trach explained to the latter that Golden Valley needed financing for its proposed shopping center; that for financing purposes it was essential that it lease a portion of its center to some firm maintaining a national credit standing; and that such financing could be procured if Winston and Newell would guarantee a proposed lease between Golden Valley and Super Valu for a supermarket to be operated by Jensen.

Throughout these negotiations Jensen and the representatives of Super Valu and Winston and Newell repeatedly made it known to Trach that they would not enter into any lease with Golden Valley for any

part of the Golden Valley shopping center unless it was agreed that no other supermarket would be constructed or operated therein. Trach agreed to this proposal and all subsequent negotiations appear to have been conducted with the understanding that it would be incorporated in the written lease to be executed as soon as questions relating to rentals and a few other matters had been settled.

In June 1953 after all terms of the lease had been agreed upon, the attorney for Super Valu was called in to prepare the lease. At that time construction of the shopping center had not yet commenced. The attorney had not seen the premises and knew nothing as to their dimensions or location. No plat or plan of the proposed center was submitted to him. When it came to drafting the proposed "noncompetition clause," he submitted a paragraph from a form used by Super Valu in leases covering property in other shopping centers. Trach approved this and asked for similar protection with respect to the Jensen property both to the north and to the east of the shopping center. This was also agreed to and paragraph 17, as above set forth, was then incorporated into the lease which was subsequently executed by the parties. The lease was guaranteed by Winston and Newell, and lessee's interest therein was taken over by Jensen. Jensen then abandoned plans for the construction of his shopping center and the four prospective lessees with whom he had been dealing were induced to lease stores in the Golden Valley project. Construction of the latter then commenced and the Super Valu market was completed and commenced operations shortly thereafter.

Some time later it was discovered that the 500-feet noncompetition area restriction expressed in paragraph 17 of the lease did not extend to or cover the westerly portion of the shopping center. Accordingly, Golden Valley proposed to lease this portion of the shopping center to Red Owl Stores for a supermarket to be constructed in the Golden Valley shopping center but not within 500 feet of Super Valu's premises. These actions followed.

■ The principal question for determination is whether the evidence as to the restrictive provisions which, it was agreed, were to be incorporated in the written lease is sufficiently definite to support the trial court's finding that a mutual mistake had occurred in drafting

paragraph 17 of the written lease as expressive of such provisions. Evidence relied upon to reform a written instrument because of mutual mistake must be clear, unequivocal, and convincing. Gartner v. Gartner, 246 Minn. 319, 74 N. W. (2d) 809. This does not mean that a party is required to establish such mistake beyond reasonable doubt. Gartner v. Gartner, *supra*. The degree of certainty essential to support a finding of reformation ordinarily rests in the judgment of the trier of fact, and the latter's determination therein will not be disturbed on appeal unless it is manifestly contrary to the evidence. Kiges v. City of St. Paul, 240 Minn. 522, 62 N. W. (2d) 363.

■ Here the evidence relied upon by Super Valu indicates ample support for the trial court's finding that there had been a definite oral agreement that Golden Valley would not lease any space in its shopping center for a second supermarket; that Super Valu would not operate a second supermarket within 500 feet of the Golden Valley shopping center; and that at all times it was the intention of both lessor and lessee that such limitations were to be incorporated in the written lease after other terms thereof were settled. The record establishes clearly that it was the policy of Super Valu to enter into leases of this kind only if assured of the elimination of competition in the area, and it would not seem likely that it would undertake to assist Golden Valley in financing the shopping center by entering into a long-term lease for space therein if it was not certain that another supermarket would not be constructed therein. Thus, when the president of Super Valu was first advised by Jensen that the latter had been approached by Trach, president of Golden Valley, relative to a lease in the latter's shopping center, he promptly made a written memorandum that:

"It would give Lenny [Jensen] control of the area because of his ownership of the property across the street.

\* \* \* \* \*

"It eliminates the possibility of a competitive food store on that spot or in the community."

That was made clear to Trach in numerous conferences. Byron M. Crippin, a representative of Super Valu, testified that he discussed the matter with Trach on a number of occasions prior to the lease and

that in such discussions it was always brought out that there was not to be another supermarket in the Golden Valley tract, and that Trach:

"* * * expressed appreciation for the fact that we would * * * sign the lease so he could go ahead then, and there was no objection to limiting it to one supermarket."

Jensen testified that at a meeting between Trach, the attorney for Super Valu, and himself just before the written lease was prepared he again advised Trach that the reason he was interested in going into Golden Valley shopping center was to eliminate competitive food markets in that community which would result from the lease and the fact that he owned the premises to the east and north of the shopping center.

The attorney for Super Valu testified that in his negotiations with Trach the latter stated that:

"* * * if we were going to restrict him as regards his putting in another grocery store or super market, that he should be protected, or that there should be a provision in the lease which would restrict us [Super Valu] from putting in another Super Valu store to the same extent that he was restricted from putting in another super market within the shopping center, and that if 500 feet was to [be] the test for him it should be controlling on us, and that we should not be permitted to put in another Super Valu store within the same distance which would serve to draw trade from the shopping center, and thus have a tendency to reduce his rent that he would be getting on a percentage of sales."

■ The record likewise supports the finding that Trach agreed to the condition that there be but one supermarket in the center. At no time when the matter was broached did he object thereto. He admitted that when he first conducted negotiations with Jensen he spoke in terms of *a* neighborhood center, or of *a* community or regional shopping center; that he was thinking only in terms of *one* supermarket in talking to representatives of Super Valu; and that he had exhibited to the latter's representatives a report by his economic expert indicating that only one supermarket was to go into the shopping center. If, as Golden Valley now contends, Trach did not orally consent to this, his

silence or failure to object to it when the prospective tenant mentioned it as a primary condition of the lease gave the latter every reason to assume that it was agreed to and would be incorporated in the lease and to execute the lease in reliance thereon. Under such circumstances, clearly Golden Valley would be estopped from asserting that it had not consented to this restriction. Browning v. Browning, 246 Minn. 327, 76 N. W. (2d) 100; Village of Wells v. Layne-Minnesota Co. 240 Minn. 132, 60 N. W. (2d) 621.

■ All parties having agreed orally that the noncompetitive provision was to be a basic part of the written lease, the fact that thereafter they may not have referred to it in their subsequent negotiations and conversations lends to rather than detracts from support of a finding that all of them had understood that this provision was to be an integral part of the lease so that no further reference thereto was necessary. The fact that the subsequent negotiations with respect to other terms of the lease did not promptly bring them together in agreement would not support or even suggest a finding that they had abandoned the important noncompetitive provision in so far as the lease is concerned. The rule applicable in situations of this kind is set forth in 16 Dunnell, Dig. (3 ed.) § 8329:

"* * * where one of the parties to a contract reduces the agreement to writing and in doing so, either through fraud or mistake, fails to conform the writing to the agreement, the instrument may be reformed. It is not necessary that the mistake should be mutual. Parties to an agreement may be mistaken as to some material fact which formed the consideration thereof or inducement thereto on the one side or the other; or they may simply make a mistake in reducing their agreement to writing. * * * in the latter case, it may be a mistake of the draftsman, or one party only. Equity interferes in such a case, to compel the parties to execute the agreement which they have actually made. It is but simple and obvious justice that mistake by one party and knowledge of the mistake by the other will justify relief as fully as mutual mistake."

Judgment affirmed.