## METRO OFFICE PARKS COMPANY v. CONTROL DATA COMPANY.

205 N. W. 2d 121.

February 16, 1973—No. 43411.

*Oppenheimer, Brown, Wolff, Leach & Foster, John D. Healy, Jr.,* and *John H. Wolf,* for appellant.

*Haverstock, Gray, Plant, Mooty & Anderson, Robert E. Bowen,* and *John S. Crouch,* for respondent.

Heard before Knutson, C. J., and Peterson, Murphy, and Schultz, JJ.

PER CURIAM.

Plaintiff lessor, Metro Office Parks Company (Metro), instituted a declaratory judgment action against defendant lessee, Control Data Corporation (Control Data), to interpret or, alternatively, to reform two leases, as amended by a supplementary agreement, the effect of which would prohibit defendant

lessee, upon termination of the leases, from initially vacating more than 25,000 square feet of leased premises aggregating more than 61,000 square feet.

The two leases between the parties were negotiated in three steps. The first lease, made on April 5, 1968, involving approximately 30,000 square feet of office space, was for the term of June 1, 1968, to May 31, 1971. The second lease, made on August 29, 1968, involving nearly 24,000 square feet of office space, was for the term of October 1, 1968, to September 30, 1971. The second lease was amended on March 15, 1969, to include additional office space of approximately 8,000 square feet. Each lease granted Control Data the option to extend the lease for a 5-year period. There is no dispute with respect to the contents of these basic lease instruments.

Two separate instruments relating to the amendment of the leases are the subject of this litigation. The first is a letter of intent, dated July 25, 1968, prior to the date of the second lease and incident to the negotiation of that lease, which in pertinent part provided:

"Pursuant to our discussions, we are pleased to offer Control Data Corporation 24,500 sq. ft. of office space in Metro Office Park Building #2, 7850 Metro Parkway. * * * The terms and conditions are to be the same as the terms and conditions of the existing lease by and between Control Data and Metro for space in Metro #1 with the following modifications:

* * * * *

3. The term of the lease is to be for three years.
4. Metro and Control Data Corporation will agree to modify the lease so that regardless of anything in either of the leases, Control Data Corporation will not vacate more than 25,000 sq. ft. in any 12 month period."

The second instrument in dispute is a subsequent supplementary agreement dated September 30, 1968, which in the following pertinent parts undertook more formally to modify the first and second leases:

▬▬▬▬▬

"WHEREAS, Article XXIII of the 7800 Metro Parkway lease and of the 7850 Metro Parkway lease gives unto the Lessee the option to extend the term thereof for a period of five (5) years and further provides that the Lessee shall have the right to terminate the lease at any time after the option to extend the original term has been exercised by giving written notice unto the Lessor at least twelve months prior to the date of any such termination; and

"WHEREAS, it is the desire and intent of the parties hereto to amend and modify the 7800 Metro Parkway lease and the 7850 Metro Parkway lease to grant unto the Lessee the right to vacate portions of the premises demised thereunder after the initial term of the leases pursuant to the notice requirement set forth in Paragraph XXIII of said leases provided, however, that CDC shall not vacate more than 25,000 square feet in any given twelve month period, all in accordance with the provisions contained herein;

\* \* \* \* \*

"1. That after the expiration of the initial term and the commencement of the extension of the original term in accordance with the provisions of the above described leases, CDC shall have the right to vacate portions of the therein demised premises, in the manner hereinafter provided, by giving written notice to Metro thereof at least twelve months prior to the date of any such vacation. Vacations of portions of the total demised premises described in both the 7800 and the 7850 Metro Parkway leases shall not exceed 25,000 square feet in any given twelve month period.

"2. Lessees twelve months notice to Lessor shall specify exactly which areas will be vacated by Lessee. No area or portion of the demised premises may be vacated without at least twelve months prior notice."

Subsequent to its execution of the supplementary agreement, Control Data decided to construct its own office building, located in the immediate vicinity of the Metro buildings. Control Data

elected not to exercise its option to renew either of the Metro leases and, instead, undertook to return the whole of the leased office space to Metro upon expiration of the initial terms of the leases. The effect would be to vacate the more than 61,400 square feet within a 4-month period.

The issue in the trial court was whether, as Control Data contended, the vacation-limiting provisions of the supplementary agreement applied only to vacations upon termination of any *extended* period of the leases or whether, as Metro contended, it applied as well to vacations upon termination of the *original* periods of the leases. The court sustained the contention of Metro, finding that the parties intended to prohibit the vacation of more than 25,000 square feet of space in *any* 12-month period.

1. The trial court's interpretation of the supplementary agreement was based upon parol evidence, the court having made a threshold finding that the agreement was ambiguous. The court expressed the ambiguity in these words:

"Exhibit E is ambiguous in that the first operative paragraph thereof numbered 1 could be construed to mean either: (1) that defendant is prohibited from vacating more than 25,000 square feet of space within any twelve month period, including the period which includes the expiration dates of Lease No. 1 and Lease No. 2; or (2) that defendant is not prohibited from vacating more than 25,000 square feet of space within a twelve month period where said vacation occurs by reason of the expiration of the initial terms of Lease No. 1 or Lease No. 2 or both, and that the limitation on vacation applies only to vacations which occur by reason of termination of the extended terms of said Leases."

We do not agree with this threshold finding of ambiguity. A writing is ambiguous if, judged by its language alone and without resort to parol evidence, it is reasonably susceptible of more than one meaning. Employers Lia. Assur. Corp. v. Morse, 261 Minn. 259, 111 N. W. 2d 620 (1961). Except for our reservation

as to the determination that the agreement was ambiguous, we would have no reservation as to the court's resolution of the asserted ambiguity.

The first sentence of the crucial paragraph 1 of the supplementary agreement, like most of the paragraphs of the agreement, plainly refers to a period "after the expiration of the initial term and the commencement of the extension of the original term." This language clearly excludes the unextended, original term.

The second sentence of that paragraph 1, to be sure, contains no such words of limitation:

"* * * Vacations of portions of the total demised premises described in both the 7800 and 7850 Metro Parkway leases shall not exceed 25,000 square feet in any given twelve month period."

Read separately from the first sentence of that paragraph and out of context with the entire agreement, the second sentence could refer to any period of the leases and would, therefore, be ambiguous. Words, phrases, or sentences cannot be dissected and read in such isolation, however, for the determination that an agreement is ambiguous must be reached through a process of synthesis in which words, phrases, and sentences are assigned a meaning in accordance with the apparent purpose of the agreement as a whole.

2. The trial court found, alternatively, that even if the supplementary agreement was not ambiguous, a failure to express the found intent was the result of mutual mistake. It accordingly ordered that the agreement be reformed by making paragraph 1 of the agreement read as follows:

"Vacations of portions of the total demised premises described in both the 7800 and 7850 Metro Parkway leases shall not exceed 25,000 square feet in any given twelve month period whether such vacations would occur, absent this agreement: (a) by reason of expiration of the original three-year term of either or both of the leases, (b) by reason of [Control Data] giving to Metro

a twelve-month notice to terminate the extended term of either of said leases or (c) by reason of termination by [Control Data] of its month-to-month tenancy status resulting from occupation of the premises after expiration of the term of either of the leases."

We hold that the order of reformation was supported by the evidence.

It is, of course, not necessary, as a prerequisite to the reformation of an instrument to conform to the intention of the parties, that the instrument be ambiguous. Rosen v. Westinghouse Elec. Supply Co. 240 F. 2d 488 (8 Cir. 1957). It is, however, necessary for the party seeking reformation to establish by clear and convincing evidence that a mistake has been made in reducing the agreement to writing and to show, with like clarity, the precise form and import the instrument should be made to assume in order to express and effectuate the real intention of the parties. The standard of proof in the trial court and the limitation of appellate review was stated in Golden Valley Shopping Center, Inc. v. Super Valu Realty, Inc. 256 Minn. 324, 329, 98 N. W. 2d 55, 58 (1959):

"* * * Evidence relied upon to reform a written instrument because of mutual mistake must be clear, unequivocal, and convincing. Gartner v. Gartner, 246 Minn. 319, 74 N. W. (2d) 809 [1956]. This does not mean that a party is required to establish such mistake beyond reasonable doubt. Gartner v. Gartner, *supra.* The degree of certainty essential to support a finding of reformation ordinarily rests in the judgment of the trier of fact, and the latter's determination therein will not be disturbed on appeal unless it is manifestly contrary to the evidence."

See also, Mosiman v. Rapacz, 250 Minn. 464, 84 N. W. 2d 898 (1957).

The negotiations leading to the second lease and the supplementary agreement were in the context of an awareness by both parties of Metro's concern over leasing a disproportionate

amount of space to one tenant. Metro manifestly would be in a position of substantial economic vulnerability were it to lease too much space to a single tenant without some limitation on the amount of space which could be turned back by the tenant within any given period of time, a hazard which would appear to be no less real at the expiration of the original term than at the termination of an extended term of a lease. Metro had concluded that it was capable of building and leasing approximately 33,000 square feet of rental office space per year in its multibuilding office park. If there were no limitation as to the amount of space which a major tenant could turn back within a given period of time, Metro could be in the position of having more space than it could rent as a result of the termination of existing leases combined with the continuing construction of additional office buildings.

Metro's managing partners accordingly established 25,000 square feet as the maximum amount of office space which Control Data should be allowed to return to Metro within any 12-month period. Although Control Data neither denied nor acknowledged an express verbal or written communication of what is conceded to be Metro's intention regarding the limitation, this intention as to the meaning of the 12-month limitation was communicated to Control Data and acknowledged by them as the proper construction to be attached to this limitation. This is illustrated by, among other things, the letter of intent agreed upon by the parties and the subsequent treatment of this limitation by personnel of Control Data involved with the negotiations. The letter of intent contained these two important paragraphs:

"3. The term of the lease is to be for three years.

4. Metro and Control Data Corporation will agree to modify the lease so that *regardless of anything in either of the leases,* Control Data Corporation will not vacate more than 25,000 sq. ft. in any 12 month period." (Italics supplied.)

The letter, drafted by employees of Metro, was approved by employees of Control Data. Apparently because of the unusual and important character of the letter, the president of Control Data personally signed it.

The trial court found that the letter of intent contained all the essential terms necessary for a binding agreement. We do not hold that letters of intent are as a matter of law enforceable agreements, nor do we understand the trial court to have so ruled. A letter of intent may be binding if the parties, as a matter of fact, manifest an intent that it be so. The label "letter of intent" is not alone determinative. Because the finding of the trial court as to the intent of the parties is not without evidentiary support, it will not be disturbed.

Control Data contends that paragraphs 3 and 4 of the letter of intent are ambiguous, asserting that the one contradicts the other. We agree with the trial court's finding that the language is not reasonably susceptible of different meanings. We think that any arguable ambiguity is effectively overborne by the unequivocal statement contained in paragraph 4.

The trial court's reading of the letter of intent was supported by the evidence of events contemporaneous with its negotiation. Control Data's intra-corporate correspondence—in the form of an approval sheet preliminary to its execution by Control Data— stated, without any limitation as to the application of the agreement, that "Control Data Corporation may not vacate more than 25,000 Sq. Ft. in any Metro Office Parks Building in any 12 month period." Similarly, the approval sheet appended to the supplementary agreement of September 30, 1968, stated: "CDC [Control Data Corporation] shall not vacate more than 25,000 sq. ft. in any twelve month period."

Control Data does not allege—nor would the evidence undergird any allegation—that either its own intention or the agreement of both parties varied during the period between the execution of the letter of intent and the supplementary agreement. The trial court could find, as it did, that the variation in language

356

was the result of inadvertence or lack of understanding by the scrivener in the choice of language by which he undertook to incorporate the terms of the letter of intent into the subsequent supplementary agreement, and that the parties by mutual mistake executed the agreement as so drafted.

We hold, without other discussion of its terms, that the trial court's ordered reformation was appropriate in effectuating the purposes of the agreement.

Affirmed.