ESTATE OF STANLEY L. WASIE (Deceased), JEROME J. CHOROMANSKI, Executor, and MARIE F. WASIE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Wasie v. Commissioner
Docket Nos. 1088-74, 8242-75.
United States Tax Court
T.C. Memo 1977-323; 1977 Tax Ct. Memo LEXIS 116; 36 T.C.M. (CCH) 1302; T.C.M. (RIA) 770323; September 21, 1977, Filed; As Amended January 11, 1978 Patrick F. Flaherty, for the petitioners. Dale L. Newland, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent initially determined deficiencies in petitioners' Federal income taxes for the calendar years as follows: [1] Dkt. No.
Year
Deficiency
1088-74
1969
$ 791.96
1970
19,582.94
1971
20,591.28
8242-75
1972
135,484.00
These cases were consolidated for purposes of trial, briefing, and opinion. *117 Concessions having been made, we are to decide whether title to certain evergreen trees was vested in Stanley L. Wasie at the time of the gift of the trees in 1969 to the Boys' Club of Minneapolis, Inc. (Boys' Club). Resolution of this question in the affirmative will require us to further determine: (1) The fair market value of the trees given to the Boys' Club by Stanley L. Wasie on December 29, 1969, as a charitable contribution; and (2) Whether Stanley L. Wasie had a return or recovery of the property in either 1971 or 1972. FINDINGS OF FACT Some of the facts were stipulated and are so found. Stanley L. Wasie and Marie F. Wasie (hereinafter referred to as Stanley and Marie) were husband and wife, who, at the time of filing the petition in Docket No. 1088-74, resided in Wayzata, Minnesota. Stanley died on June 13, 1974. The executor of Stanley's estate is Jerome J. Choromanski whose legal residence was in Minneapolis, Minnesota, at the time of filing the petition in Docket No. 8242-75. Stanley and Marie timely filed joint Federal income tax returns for the years 1969 and 1970 with the Internal Revenue Service Center at Kansas City, Missouri, and with the Internal *118 Revenue Service Center at Ogden, Utah, for the years 1971 and 1972. The Don Mar Farms (Farm), located in Scott County, Minnesota, comprises approximately 671 acres of land. During the period from 1957 through 1961, Stanley used ten parcels of land (roughly 35 acres in total) on the Farm, then owned by Merchants Motor Freight, Inc., [2] as the site for the planting of about 266,000 evergreen seedlings. Ownership of the Farm was subsequently acquired by Stanley on March 9, 1962. Several years later, on April 21, 1964, Stanley and the Donald A. Wasie Trust (Trust) [3] signed a purchase agreement and option under which Stanley conveyed to the Trust an undivided one-half interest in the Farm for $72,969.56. [4] In addition, the agreement gave the Trust the option to purchase Stanley's remaining one-half interest for a like amount of money. Exercising this option, the Trust purchased such remaining interest in the Farm on October 31, 1966. These successive transfers of the Farm to the Trust in 1964 and 1966 were accomplished with quitclaim deeds. *119 Although ownership of the trees was not specifically reserved by Stanley in the above deeds, the evergreens nonetheless continued to be recorded as an asset on his personal books of account. [5] In addition, throughout the period from 1964 through 1969, any expense or income accruing as a result of the trees was debited or credited to Stanley's personal account. On December 29, 1969, Stanley, Marie, the Trust, and its sole beneficiary, Donald A. Wasie, signed a written instrument for the purpose of "clarifying * * * apparent ambiguities and uncertainties" in the deeds which were used to convey the Farm to the Trust. This instrument read, in pertinent part, as follows: The parties, by their signatures hereto, hereby affirm that [Stanley] at all times retained, and at the present time retains, total ownership interest in all of the trees located on the [Farm] * * *, and that the parties fully intended at all times that the [deeds] * * * would reflect the fact that the parties' intentions and understandings were and are that *120 [Stanley] would and does retain his total ownership interest in the trees free and clear of the claims of any of the other parties * * *. Concomitant with the signing of the above, Stanley executed a Deed of Gift which purported to transfer title to the evergreens on the Farm to the Boys' Club. [6]
On the date of the gift, the general condition of the trees was not good. Specifically, granular-type soil existed in some of the growing areas making digging, balling, and transportation of the trees difficult. Practically none of the trees had been root pruned. Nor had many of the trees previously been trimmed or shaped during the growing period. Weed and grass control in the growing areas was ineffective. An apparent over-application of Simazine, a weed-killing chemical, had caused discoloration of many of the trees. Some of the trees were inflicted with spruce needle miner and cytospora canker disease. Finally, by 1969 the trees had reached a height of four feet, and because they were originally planted only forty-four inches apart, were growing in very crowded conditions. This *121 latter fact has other significance in that it prevented an inspection of the trees by the Minnesota Department of Agriculture. Under Minnesota law such inspection is required before any evergreen trees can be sold or distributed as nursery stock. The inspections, which culminate in the issuance of a certificate, are performed annually to determine if the trees are in a sound and healthy condition. An application for certification of the trees on the Farm was submitted by, and a certificate was issued to, Stanley for each year from 1962 through 1967. Thereafter, the trees had grown so close together and the weeds surrounding them had been allowed to grow to such an extent that it made inspection of the trees impossible. As a consequence, no certificate was obtained during all relevant times thereafter. However, had an inspection been possible a certificate would have been issued with respect to a portion of the trees. Subsequent to the date of the gift, the Boys' Club made several attempts to dispose of the trees. However, only one offer for the purchase of the entire stock was received. On May 2, 1970, Walter Carpenter of Minnesota Tree, Inc., offered the Boys' Club $21,000 *122 for all of the trees. This offer was subsequently refused. Because the trees were uncertified and because they had no one who could devote any significant amount of time to the marketing of the trees, the Boys' Club on December 13, 1971, attempted to return the trees to Stanley. Stanley communicated his refusal to accept the trees on December 27, 1971. Neither Stanley nor his successors-in-interest has, since the date of the gift, asserted title to, or exercised dominion and control over, the trees. Several years later, in an attempt to raise money, a local girl scouts' club became interested in selling the evergreens as Christmas trees. Due to their efforts, approximately 2,000 trees were sold in 1974 and 1975 for about $9,800. The trees donated to the Boys' Club have been the subject of several appriasals. In January 1970, Gordon Stodola and Allyn Lindstrom were hired by Stanley to appraise and count the trees. Stodola estimated there were 49,701 trees with a total estimated value of $107,116.25. Lindstrom, on the other hand, found the number of trees to be 49,970 with an aggregate fair market value of $231,785. Respondent's expert, Walter Carpenter, placed the value of *123 the trees at $21,000 and estimated their numbers at approximately 36,000. On Stanley and Marie's Federal income tax return for 1969, a charitable contribution to the Boys' Club of $231,785 was shown. Due to limitations on the amount of charitable contributions deductible during any one year, only $28,499.35 was claimed by Stanley and Marie in 1969 and the remainder was carried forward with $44,931.33, $42,972.00 and $115,332.00 deducted in 1970, 1971, and 1972, respectively. [7]
In his notice of deficiency, respondent disallowed all but $31,160 as a charitable deduction. Subsequently, in an amended answer, respondent disallowed the claimed charitable deduction in its entirety based on his conclusion that Stanley did not own the trees at the time of the purported gift. OPINION. The first issue for decision is whether title to certain evergreen trees was vested in Stanley at the time of the gift of the trees to the Boys' Club. If we find Stanley did not own the trees at the time of the gift, then the charitable deduction claimed *124 by petitioners must be disallowed in its entirety. Respondent contends, and petitioners do not disagree, that under Minnesota law nursery stock is considered realty for conveying purposes. Thus, he argues, Stanley, by his successive conveyances of the Farm in 1964 and 1966 without expressly reserving an interest in the trees, transferred legal title to the trees to the Donald A. Wasie Trust. He therefore concludes that Stanley was not entitled to claim a charitable deduction for a gift of property which he did not own. Admitting that the deeds in question contained no specific reservation of the evergreen trees, petitioners nevertheless argue that the evidence shows the parties intended ownership of the trees be retained by Stanley. It is their position that the agreement of December 29, 1969, operated as a reformation of the deeds, due to their mutual mistake, thereby confirming that Stanley did indeed own the trees. We agree with petitioners. Under Minnesota law, a written contract is not required to be ambiguous on its face to allow its reformation to conform with the intention *125 of the parties. Rosen v. Westinghouse Electric Supply Company,240 F.2d 488 (8th Cir. 1957). Reformation will be permitted where there has been an actual agreement between the parties, their minds have met on the terms which they intended the writing to express, and where, due to a mutual mistake, the writing fails to express those terms. Gartner v. Gartner,246 Minn. 319, 74 N.W.2d 809, 812 (1956). So although it is admitted that the deeds in question contained no words of specific reservation of ownership of the evergreen trees, if the parties intended that such ownership was to be retained by Stanley, the deeds may be reformed to reflect that fact. The parties' intentions in these cases are a question of fact. Johnson v. Giese,231 Minn. 258, 42 N.W.2d 712 (1950). Unfortunately, at the time of the trial in this case, Stanley L. and Donald A. Wasie, the two parties whose intentions we must determine, were both deceased. Nonetheless, we find there is sufficient evidence in the record for us to conclude that Stanley did intend to reserve ownership of the trees. To begin with, the sales price paid by the Trust for the Farm *126 was based on values reflected on the Farm's balance sheet of April 1, 1964. Noticeably missing from the list of the assets on that balance sheet was the tree inventory located on the Farm. This omission is evidence that the Trust never intended to purchase the trees. Secondly, the books of the partnership between Stanley and the Trust, as well as Stanley's personal books of account, showed the trees to be an asset of Stanley's. Moreover, Stanley paid all the expenses of the trees and reported any income from their sale during the period from 1964 to 1969. Finally, the agreement of December 29, 1969, clearly and unambiguously shows that the parties agreed thought the years preceding the gift to the Boys' Club that Stanley retained ownership of the trees themselves, even though such specific reservation was not mentioned in the deeds. Respondent further argues that reformation cannot occur without a decree of reformation from a Minnesota court. We cannot agree. Where, as in the instant case, all the parties to an instrument are suijuris, and all concur to its alteration in accordance *127 with the parties' original intentions, at least as between the parties, a court decree proclaiming the same is not required before legal effect will be accorded the reformed instrument. Cf. School Dist. No. 1 v. Security State Bank,181 Minn. 537, 233 N.W. 296 (1930); First Nat. Bank v. Northwestern Trust Co.,181 Minn. 115, 231 N.W. 790 (1930); Leach v. Leach,162 Minn. 159, 202 N.W. 448 (1925); Greve v. Coffin,14 Minn. 345 (1869). In view of the foregoing, we hold that Stanley owned the trees on December 29, 1969, and is entitled to a charitable deduction for their contribution to the Boys' Club. The second issue for decision is the fair market value of the trees donated by Stanley to the Boys' Club on December 29, 1969. In this regard, section 1.170-1(c), Income Tax Regs., provides in part: If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the ocntribution. The fair market value *128 is the price, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * Petitioners maintain that the fair market value of the trees on the date of the gift was $231,785. Respondent, on the other hand, maintains the value of the gift was no more than $31,160. [8] In support of their respective valuations, petitioners and respondent each offered the testimony of several expert witnesses. *129 Despite the fact that the experts agreed no large quantity of trees could be sold without state certification, [9] it was not entirely clear from any of the valuation reports whether the values contained therein took into account any expense that would have to be incurred to have the trees certified. Nor was it all that clear that the values presented reflected certain costs that would be required in digging, balling, and transporting the trees. Although petitioners contend the fair market value of the trees on December 29, 1969, was $231,785, their only credible expert placed the trees' fair market value at $107,116.25. [10] However, we believe that even this valuation is excessive. First of all, the report of petitioners' expert made no mention of what it would cost to market the trees. Secondly, his report and testimony were not totally candid. For example, he testified *130 that during his appraisal he saw no weed problems. However, he also testified that there was two feet of snow on the ground at the time. Thirdly, we believe that he was overly generous in finding a positive value for every single tree when undoubtedly it would cost more to remove some of the trees than what could be realized upon their subsequent sale. Moreover, he admitted at the time the appraisal was made he was unable to recognize either spruce needle miner or cytospora canker disease. The valuation at $21,000 of respondent's expert was premised on his offer of May 5, 1970, to purchase the trees. Because of his desire to purchase the trees, he had a proprietary interest in valuing the trees as low as possible. Therefore, his report can hardly be considered that of a disinterested party and we accordingly give it little *131 weight. After having carefully examined and analyzed all the evidence contained in the record pertaining to the value of the trees in question, and after having considered the opinions of the expert witnesses and their qualifications, we conclude that the fair market value of the trees transferred by Stanley on December 29, 1969, was $52,000. [11]
The final issue for decision is whether Stanley had a return *132 or recovery of the trees in 1971 or 1972. If we find that Stanley did have a return or recovery of the trees, then petitioners would be required to report as income in the year of return or recovery the amount of any charitable deduction allowed for the trees returned. See Alice Phelan Sullivan Corporation v. United States,381 F.2d 399 (Ct. Cl. 1967). Respondent contends that petitioners either had a return of the property in 1971 when the Boys' Club tendered return of the trees to Stanley, or, in any event, if Stanley did not recover the property in 1971, he certainly did in 1972 when the three-year right of access to the trees granted to the Boys' Club in the Deed of Gift expired. Respondent's contention that Stanley recovered the trees in 1971 can be summarily dismissed. The Boys' Club, acting through its Executive Committee, attempted return of the trees to Stanley on December 13, 1971. Stanley refused to accept the trees and so notified the Boys' Club on December 27, 1971. Furthermore, there is no evidence in the record showing that Stanley exercised any dominion and control, or asserted any traditional rights of ownership, over the trees after 1969. *133 Accordingl8y we hold that Stanley did not recover the trees in 1971. As to respondent's contention that Stanley recovered the trees in 1972, petitioners argue that the trees were transferred in fee simple absolute to the Boys' Club with no possibility of reverter in Stanley. Petitioners further maintain that the three-year right of access to the trees granted to the Boys' Club was "merely a reasonable provision inserted to protect the marketablity of the title of the owner of the underlying real estate." If the Boys' Club failed to remove the trees within the three-year period, petitioners maintain that the Boys' Club would thereafter have had to negotiate with the owner of the land, the Trust, for continued access to the trees. In any case, there was no possibility of the evergreen trees reverting back to Stanley. We agree with petitioners. To begin with, Stanley through his deed of gift gave away all his ownership interest in the trees. The deed of gift did not, nor was it intended to, create a reversion through the three-year right of access. We also believe the three-year period was a reasonable amount of time in which to expect removal of the trees. Moreover, as stated *134 above, there is no evidence in the record to support the conclusion that Stanley or his successors exercised any dominion and control over the trees after 1969. Thus, we hold Stanley had no recovery of the trees in 1972. To reflect the foregoing, Decision will be entered under Rule 155." Footnotes
1. Respondent in an amended answer increased the deficiencies in Docket No. 1088-74 based on his then belief that in 1969, Stanley L. Wasie did not own the trees which were the subject of a purported charitable contribution. The arguments made by respondent for the increased deficiencies will be dealt with in our opinion.↩
2. Merchants Motor Freight, Inc. was owned by Stanley.↩
3. The Trust's sole beneficiary was Donald A. Wasie, the adult son and only child of Stanley and Marie. At all relevant times herein, Stanley was the sole trustee of the trust. Donald A. Wasie died on April 24, 1973. ↩
4. The price paid represented one-half of the total asset value reflected on the Farm's balance sheet of April 1, 1964. Said balance sheet did not include the trees as an asset.↩
5. Consistent with the treatment of the trees as an asset of Stanley's was the fact that they were not recorded as an asset of the partnership.↩
6. The deed also granted to the Boys' Club a three-year right of access to the trees.↩
7. Although Stanley and Marie originally claimed a charitable contribution of $231,785, they ultimately deducted only a total of $231,734.68.↩
8. At the outset, respondent contends the evergreens were valueless as nursery stock because Minnesota law prevented their sale without certification. We might find merit in this contention were certification withheld because many or all of the trees would have failed to pass state inspection standards; however, it is clear that a certificate was not issued because the inspection procedures could not be followed due to the crowded conditions in the growing areas. We believe, however, there is sufficient evidence in the record to show that had a buyer been found, arrangements for the inspection and certification of the trees could have been made--albeit at whatever expense was necessary to make inspection possible. Thus, we find the absence of certification only to be one factor in determining the fair market value of the trees.↩
9. Although the record contains conflicting reports as to the exact number of trees contained in the gift, it was about 49,000. However, in light of the generally poor condition of the trees on the date of the gift, of this total a significant portion could not be considered of "marketable" quality.↩
10. Petitioners presented an expert who valued the trees at $231,785. Not only was this expert's estimate far removed from the other experts' values, we believe his report and testimony were seriously impeached upon cross-examination. With his credibility challenged, and after viewing his demeanor at trial, we have completely disregarded his report.↩
11. We are mindful that the girl scouts acquired for sale as Christmas trees in 1974 and 1975 a small number of the evergreens from the Boys' Club. Their agreement was to remit to the Boys' Club one-half of whatever they received on the subsequent sale of the trees at what appears to be a premium price. Unfortunately, the insufficiency of evidence about the Christmas tree market at the time of the gift vis-a'-vis the trees in question, the fact that the transactions occurred some fur and five years after the gift was made, the nonprofit status of both organizations, and the negligible labor costs attributable to the volunteer labor will not permit us to attach much probative worth to these transactions as evidence of the trees' fair market value on the date of the gift.↩