BRIGGS TRANSPORTATION
CO., Appellant,

v.

SECOND NORTHWESTERN NATION-
AL BANK OF MINNEAPOLIS, et
al., Respondents.

No. C3–87–33.

Court of Appeals of Minnesota.

May 19, 1987.

Review Denied July 9, 1987.

Thomas R. Sheran, Margaret M. Van Valkenburg, O'Connor & Hannan, Minneapolis, for appellant.

Jerry W. Snider, Steven L. Severson, Faegre & Benson, Minneapolis, for respondents.

Heard, considered and decided by PARKER, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

PARKER, Judge.

This appeal is from a summary judgment dismissing appellant's cause of action alleging that respondents overcharged interest on certain loans. We hold that a genuine issue of material fact exists as to whether respondents breached the agreements, and we reverse.

## FACTS

Appellant Briggs Transportation Company ("Briggs") is a corporation that was engaged in the interstate trucking business until about 1984, when it went bankrupt. Respondents Second Northwestern National Bank of Minneapolis (Second Northwestern), Northwestern National Bank of Minneapolis (Norwest), Exchange National Bank of Chicago, f/k/a Central National Bank of Chicago (Central), and IntraWest Bank of Denver (IntraWest) are all national banking associations. Respondent Bankers Trust Company (Bankers Trust) is a state-chartered bank. Respondents will be collectively referred to as "the banks" herein.

This appeal arises out of two loan agreements entered into between Briggs and the banks. The first loan agreement was dated December 29, 1975; the second was dated May 1, 1980. Both agreements were drafted by the banks.

Under the terms of the 1975 loan agreement, Central, Bankers Trust, IntraWest, and Second Northwestern agreed to make loans to Briggs up to a maximum aggregate principal amount of $11 million at any one time outstanding. Section 2.03 of the loan agreement provided that the interest charged to Briggs would be "computed at a rate equal to one-half of one percent (½ of 1%) above the Prime Rate." Section 1.01(r) of the 1975 agreement defined "Prime Rate" as

the lowest interest rate regularly charged from time to time by Central on 90–day so-called 'large business' loans to corporate commercial customers of the highest credit rating; any change in such rate shall, for the purposes hereof, take effect as of the date on which such change is publicly announced by Central or such date thereafter as may be specified as the effective date in such public announcement.

The 1980 loan agreement was the result of a renegotiation of the 1975 loan agreement. In connection with the execution of the 1980 agreement, it was agreed that Second Northwestern would purchase the outstanding loans made to Briggs by the other banks pursuant to the 1975 loan agreement and that, thereafter, Briggs would pay its outstanding indebtedness to Second Northwestern according to the terms and conditions stated in the 1980 loan agreement. Pursuant to the terms of a separate "Inter-Creditor Agreement," respondents Norwest, Exchange, Bankers Trust and IntraWest participated in the loan under the 1980 loan agreement.

Section 1.03 of the 1980 loan contained that agreement's interest provision:

The Company promises to pay to the Bank * * * (b) interest on the principal amount of indebtedness unpaid hereunder from time to time outstanding from the date hereof until said principal amount is paid in full at an annual rate (computed on the basis of actual number of days elapsed in a 360–day year) equal to 1% over the prime rate of interest charged by Northwestern National Bank of Minneapolis on 90–day unsecured loans to commercial borrowers of the highest credit rating and that shall change when and as said prime rate shall change * * *.

During the term of the 1980 loan agreement, the banks charged Briggs interest one percent above the rate that Norwest announced to the public as its prime rate. Although Norwest contends it did not make any "90–day unsecured loans to commercial borrowers of the highest credit rating" during the term of the 1980 loan, its vice president testified by deposition that if such loans had been made, they would have been made at the announced prime rate. Both Central and Norwest conceded in interrogatories that they made or renewed loans to commercial customers during each relevant rate period at an interest rate lower than the rate used by the banks as the reference rate in the Briggs loan agreements.

During the performance of the 1980 loan agreement, the banks alleged that Briggs breached certain covenants relating to its financial condition. On November 1, 1982, Second Northwestern called due the loan to Briggs, claiming that Briggs had continued to breach the loan agreement. Sometime in 1982, Briggs formed the opinion that Second Northwestern had overcharged it for interest on the loan. Briggs then commenced this lawsuit seeking to recover the interest it had allegedly overpaid.

Briggs' original complaint alleged seven separate counts, but six were dismissed with prejudice by stipulation of the parties. The remaining count alleged the banks charged Briggs interest in excess of the amount set forth in the 1975 and 1980 loan agreements. Specifically, Briggs contended the banks breached the loan agreements by using an interest rate tied to the rates that Central and Norwest *announced* as their prime rate, rather than the lowest rate of interest *actually charged* by the

banks on 90–day unsecured loans to corporate commercial customers of the highest credit rating. The latter figure, Briggs claimed, would have resulted in lower interest charges.

In 1986 the banks moved for summary judgment, seeking dismissal of Briggs' remaining count. Briggs responded by renewing its motion for partial summary judgment, which the court had previously denied. On October 8, 1986, the trial court granted the banks' motion and denied Briggs' motion, ruling:

> In granting defendants' motion, the Court expressly holds that the agreement is unambiguous and that the term "prime rate" refers to the publicly-announced prime rate. That term means that rate of interest which banks announce as their prime rate of interest and generally reflects the lowest rate of interest charged to their commercial customers of the highest credit rate on short term unsecured loans.

Briggs appeals from the summary judgment.

## ISSUE

Did the trial court err in ruling that the parties' use of the term "prime rate" was unambiguous and meant "announced prime rate" and therefore granting the banks' motion for summary judgment?

## DISCUSSION

Summary judgment has been described as a "blunt instrument" to be employed "only where it is perfectly clear that no issue of fact is involved * * *." *Donnay v. Boulware*, 275 Minn. 37, 45, 144 N.W.2d 711, 716 (1966). In reviewing a summary judgment, this court must determine whether any genuine issues of material fact exist and whether the trial court erred in its application of the law. Minn.R.Civ.P. 56.03; *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). If any doubt exists as to the existence of a genuine issue of material fact, the doubt must be resolved in favor of finding that the fact issue exists. *Rathbun v. W.T. Grant Co.*, 300 Minn. 223, 230, 219 N.W.2d 641, 646 (1974). The court must view the evidence in the light most favorable to the party against whom summary judgment was granted, and doubts and factual inferences must be resolved against the prevailing party below. *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn.1981).

"Whether a contract is ambiguous is a legal determination in the first instance." *Blattner v. Forster*, 322 N.W.2d 319, 321 (Minn.1982); *Fena v. Wickstrom*, 348 N.W.2d 389, 390 (Minn.Ct.App.1984). "A writing is ambiguous if, judged by its language alone and without resort to parol evidence, it is reasonably susceptible of more than one meaning." *Metro Office Parks Co. v. Control Data Corp.*, 295 Minn. 348, 351, 205 N.W.2d 121, 123 (1973). We hold that the agreements were not reasonably susceptible of more than one meaning and therefore were not ambiguous.

The trial court found that the agreements allowed the banks to charge Briggs interest based on the announced prime rate, but the court cited no authority for its conclusion. Looking at the plain language of the agreements, we find no support for this interpretation. The only mention of prime rate announcements occurs in Section 1.01(r) of the 1975 agreement, which contains two separate clauses separated by a semi-colon. The first clause, which defines "prime rate," makes no mention of announcements:

> "Prime Rate" shall mean the lowest interest rate regularly charged from time to time by Central on 90–day so-called 'large business' loans to corporate commercial customers of the highest credit rating;

It is only in the second clause that an *announced* prime rate is mentioned. This clause, however, does not purport to *define* "prime rate;" it merely sets forth the method for determining the time at which changes in the prime rate take effect:

> [A]ny *change* in such rate *shall*, for the purposes hereof, *take effect* as of the date on which such change is publicly announced by Central or such date thereafter as may be specified as the effective date in such public announcement.

(Emphasis supplied). Since there is no other mention of the announced prime rate in either of the loan agreements, we find no support in the language of the contracts for the proposition that the loan agreements unambiguously defined "prime rate" as "announced prime rate."

We hold, therefore, that the 1975 loan agreement unambiguously required the banks to base their interest charges on the lowest interest rate actually charged by Central and Norwest to commercial borrowers of the highest credit rating on 90-day "large business" loans. The 1980 agreement, in defining "prime rate," stated that Briggs' interest would be based on "the prime rate of interest charged by [Norwest] on 90-day unsecured loans to commercial borrowers of the highest credit rating." This language similarly refers to interest rates that are actually charged, rather than announced.

■ Thus, the issue is whether the banks complied with the agreements, as interpreted above. Since the banks conceded making or renewing loans to commercial customers during the relevant period at an interest rate lower than the announced prime rate on which they based Briggs' interest, this presents a genuine issue of material fact and summary judgment is inappropriate.

### DECISION

The trial court clearly erred in granting the banks' motion for summary judgment. The language of the loan agreements did not support a finding that the interest charged to Briggs was to be based on the banks' announced prime rate. Whether the banks violated the agreements presents a genuine issue of material fact to be decided by the finder of fact below.

Reversed.