PRODUCTION CREDIT ASSOCIATION
OF EAST CENTRAL WISCONSIN,
Plaintiff,

v.

FARM CREDIT BANK OF
ST. PAUL, Defendant.

Civ. No. 4–90–542.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 19, 1991.

Scott E. Richter, Clifford M. Greene, Frank A. Taylor, Mary C. Hipp, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, Minn., David Edquist, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for plaintiff.

Wallace G. Hilke, Thomas L. Fabel, Lindquist & Vennum, Minneapolis, Minn., Mark Sostarich, Godfrey & Kahn, Milwaukee, Wis., for defendant.

### MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendant's motion for summary judgment. The motion will be granted.

FACTS

Plaintiff Production Credit Association of East Central Wisconsin (East Central) and defendant Farm Credit Bank of St. Paul (the Bank) are lending institutions existing within the Farm Credit System, which was created by Congress to assure a supply of reasonably priced credit for farmers, ranchers and agricultural cooperatives throughout the nation. Def.'s Mem. in Supp. of Summ. J., Williams Aff. ¶ 3. The Farm Credit System has national, district and local components. East Central functions on the local level, providing loans directly to farmers and ranchers. The Bank functions on the district level as an intermediate lending institution providing funds to local production credit associations (PCAs), including plaintiff. The Bank serves the Seventh District, which covers Michigan, Minnesota, North Dakota and Wisconsin. On the national level, the Federal Farm

Credit Banks Funding Corporation (FFCBFC) provides funds for the system through the sale of tax-favored bonds, and the Farm Credit Administration (FCA) oversees the entire system. *Id.* ¶ 4.

The lending institutions within the Farm Credit System are discrete institutions, with different ownership, management, and, in some cases, interests. Under federal regulations, each individual institution must meet solvency requirements in order to avoid regulatory shutdown or takeover. However, the institutions are also closely interrelated through stock ownership and loss sharing. When farmers borrow money from their local PCA, they are required to purchase stock in the institution; the borrower's stock investment is repaid when the loan is retired, if the PCA has the financial resources to redeem the stock. Similarly, local PCAs are required to purchase stock in the district banks. The federal bonds that fund the system are the joint and several liability of all banks in the system, thus creating a " 'one for all and all for one' legal reality which runs throughout the breadth and history of the [s]ystem." Williams Aff. ¶ 3.

The relationship between the Bank and East Central is governed by various contracts, the most significant of which is the General Financing Agreement, which sets out the terms by which the Bank provides funds to East Central. The interest rates that the Bank charges the PCAs differ depending on the relative financial strength or distress of the PCA. In addition to acting as a wholesale lender for the PCAs, the Bank exerts some supervisory control over them, through the lending agreements. The Bank also monitors the performance of the PCAs through a central computer on which the books of each PCA are stored. The Bank maintains a specialized staff of financial professionals who provide information and advice to the PCAs.

This dispute between the Bank and East Central arises out of the farm credit crisis of the mid–1980s. As land values collapsed and farm income declined, the Farm Credit System was brought to the brink of collapse. Because system institutions are jointly and severally liable for the bonds that fund them, the collapse of any institution in the system affects the other institutions. The system responded to the farm credit crisis by activating pre-existing loss sharing agreements among various components of the system; these agreements took various forms, but involved transferring retained earnings from healthy institutions to unhealthy institutions, thus saving them from regulatory insolvency. Williams Aff. ¶ 5. Congress responded to the crisis in 1987 by creating the Farm Credit System Assistance Board (FAB), which was empowered to use funds raised from the sale of bonds to purchase preferred stock from district banks, thereby providing qualifying district banks an infusion of funds. The infusion was not, however, a direct grant; banks who received the funds are required to retire stock within fifteen years, or pay substantial dividends. *Id.* ¶ 9.

On the local level, the PCAs, like the district banks, were experiencing a financial crisis. The financial difficulties of the PCAs were exacerbated in 1985 by regulatory changes in accounting requirements. Prior to 1985, the balance sheet allowance (or reserve) for anticipated loan losses was governed by "regulatory accounting principles" which required that system lenders set aside a percentage of their loan volume as a reserve for loan losses. Congress deemed this method unreliable, and passed legislation in 1985 requiring system institutions to follow "generally accepted accounting principles" (GAAP) to establish loan loss allowances. Under GAAP, institutions must estimate and reserve their actual estimated exposure for loan losses. To create sufficient allowances for newly estimated losses, PCAs had to record large "provision expenses" on their balance sheets.

As the provision expenses rose, the threat arose that the PCAs would suffer "stock impairment." *Id.* ¶ 11. "Stock impairment" occurs when the book value of member stock is less than the price paid for the stock; in 1986 and 1987, an institution whose stock was impaired could not redeem its stock at par value. Stock impair-

ment is grounds for regulatory closure and can ruin a PCA by destroying member/borrower confidence. *Id.* ¶ 13. In some districts, the threat of stock impairment was staved off by merging healthy PCAs with unhealthy ones. In the Seventh District, the objective was accomplished by entering into loss sharing agreements by which assets were transferred from the Bank to the PCAs. *Id.* ¶ 10.

The parties agree that by 1986, East Central was experiencing severe financial distress. This was in part due to the new accounting procedure for loan allowances; plaintiff, like many other PCAs, entered a large provision expense on its 1986 income statement.[1] Plaintiff's financial distress, however, was not due only to the new accounting procedure. East Central's 1986 annual report noted that its credit quality had declined, that its ratio of net interest income as a percentage of average earning assets was at a five-year low, and that its return on average assets and on average capital was negative in 1985 and 1986. Pl.'s Mem., Ex. 52, McCance Aff. ¶ 4. In 1986, plaintiff's financial condition led its auditors to require a going-concern qualification in East Central's financial statements, which stated that "the ability of the PCA to remain a going concern may depend on continued financial assistance from the [Bank] or other system entities." Pl.'s Mem., Ex. 52 at 20. In early 1987 the Bank's auditors included East Central on a list of those PCAs that had suffered the most serious losses. Pl.'s Mem., Ex. 58.

In May 1986, the Bank [2] and East Central executed a loss-sharing agreement. Pl.'s Mem. Ex. 16 (hereinafter the 1986 agreement). Paragraph 1 of the agreement provides:

[The Bank] shall share in losses of [East Central] by providing funds at any time between the date of execution of this Agreement and December 31, 1986, in that dollar amount that is necessary to maintain the surplus account of [East Central] at $100,000.00, after allowance for loss has been established by the PCA in accordance with generally accepted accounting principles.

Paragraph 7 of the agreement provides:

It is understood by the parties hereto that this is an agreement whereby the [Bank] shall share losses with the PCA up to a specified dollar amount within a specified time frame. PCA shall not rely upon this Agreement for any other purpose nor interpret it to have any other meaning or significance.

The agreement does not set forth the manner in which the funds would be provided, nor does it define "funds." In fact, however, the Bank provided funds to East Central by recording an account receivable on East Central's books, and a corresponding account payable on the Bank's books.[3] The amount of the account receivable fluctuated, in accordance with the agreement, but as of December 31, 1986 the Bank had recorded some $3.3 million as an account payable on its books and as an account

---

1. Defendant asserts that plaintiff overestimated its loan loss allowance by several million dollars, resulting in the entry of a large provision expense on its income statement. Def.'s Mem., Hilke Aff. ¶ 4, 5, 6. Plaintiff disputes this assertion, stating that defendant cites figures from early in 1986 that were based on unaudited figures, rather than the loan allowance figures reflected in East Central's 1986 annual report. These figures, plaintiff asserts, were audited and attested to by Price Waterhouse after extensive review under GAAP. Pl.'s Mem., Ex. 52, Akason Aff. ¶ 21, Mathys Dep. at 104–06. Plaintiff's version of the facts regarding the provision expense must be taken as true for the purposes of this motion.

2. The agreement was actually executed by East Central and the Bank's predecessor, the Federal Intermediate Credit Bank of St. Paul. Prior to 1987, there were two types of intermediate lending institutions in the Farm Credit System: federal intermediate credit banks and federal land banks. The Agricultural Credit Act of 1987, Pub.L.No. 100–233, 101 Stat. 1568 (1988) created district banks, such as defendant, by merging the federal intermediate credit banks and the federal land banks. Def.'s Mem. at 4. In this memorandum, defendant and its predecessor organizations are referred to collectively as the Bank.

3. Because East Central's books were stored on the Bank's St. Paul computer, Bank personnel made the entries on East Central's books as well as on the Bank's. Pl.'s Mem., Engel Dep. 34–35, Anderson Dep. 20–21, 23.

receivable on East Central's books. Pl.'s Mem., Ex. 52; Def.'s Mem. at 16.

The parties executed a second financial assistance agreement in March of 1987. Pl.'s Mem., Ex. 18 (hereinafter the 1987 agreement). This agreement was part of the General Financing Agreement, which governed all credit relations between plaintiff and defendant. Pl.'s Mem., Kettering Dep. at 11–12, Johnson Dep. at 48–49, 52–53. Paragraph 4 of the 1987 agreement provides:

> As of the date of this Agreement, [the Bank] has provided outstanding financial assistance in an amount totaling ... $3,351,069. The purpose of this assistance was to prevent the impairment of [East Central's] outstanding capital stock, enabling PCA to redeem its stock at par and continue making loans and selling its capital stock.
>
> Subject to PCA being in compliance with all the terms and conditions in this Agreement, [the Bank] hereby agrees to continue to provide the above amount of assistance to the end of this Agreement, March 31, 1988. [The Bank] has at its sole discretion the right but not the obligation to increase the foregoing amount of financial assistance.
>
> The conversion of any financial assistance being carried as an account receivable from the [Bank] on the PCA's financial statements into cash or a cash equivalent will be determined by the process documented in "Exhibit B." ...

The formula for cash conversion contained in Exhibit B to the 1987 agreement linked cash conversion of the account receivable to actual loan losses incurred by East Central through loan charge-offs.

In late spring of 1988, the Bank informed East Central that the account receivable had served its purpose and that East Central would be required to reverse the receivable from its books. East Central protested, instead demanding that the account receivable be converted to cash. While the dispute between the parties was pending, the Bank was pursuing funding from the

Farm Credit Assistance Board (FAB). In correspondence with the Bank, the FAB stated that any proposal for funds was required to address the financial needs of all PCAs in the district. Pl.'s Mem., Ex. 32. In July 1988, the Bank submitted a proposal for funding to the FAB; this proposal asked for, among other things, funds to alleviate the financial needs of four southern Minnesota PCAs and a Grand Forks PCA. Pl.'s Mem., Ex. 37 at 6–7.

The proposal was not granted, and in September 1988 the Bank submitted a new proposal. This proposal requested $58 million on behalf of the southern Minnesota and Grand Forks PCAs and an additional $4 million "to resolve financial assistance payables to other associations." Pl.'s Mem., Ex. 41 at 6. The only other PCAs mentioned in the proposal were East Central and St. Cloud. The proposal earmarked $1 million for the St. Cloud PCA; as to East Central, the proposal stated that, "Negotiations for East Central Wisconsin are underway. It now appears that a portion of the $3.3 million [receivable] would be 'cashed' out, and the balance of the payable reversed." *Id.* at 38. In fact, however, there were no ongoing negotiations regarding cashing out the receivable; the Bank account officer serving East Central testified that the proposals discussed throughout 1988 were about phasing out the reversal of the receivable, not about converting it to cash. Pl.'s Mem., Foss Dep. at 198–98. The FAB granted the Bank's September proposal, providing the Bank the full $133 million that it had requested. Pl.'s Mem., Johns Dep. at 87–88, Buegler Dep. at 59, 61. The agreement between the Bank and the FAB required the Bank to apply some of this money to cash out the Southern Minnesota PCAs and to provide financial assistance to the Grand Forks PCA. It did not, however, require the Bank to provide cash to East Central. Pl.'s Mem., Ex. 42.

Early in 1989, the Bank informed East Central that any cash conversion would be based on its need for cash to preserve "viability."[4] Pl.'s Mem., Salm Aff. ¶ 23.

---

4. The parties have not provided a definition of viability. However, according to deposition tes-

Plaintiff asserts that it never agreed that cash assistance would be based on viability, but that it nevertheless submitted a proposal establishing that it needed cash assistance to remain viable. The Bank rejected this proposal on the grounds that East Central could achieve viability without cash assistance if it cut costs and raised interest rates. Pl.'s Mem., Ex. 47; Def.'s Mem., Johns Aff. ¶ 6, Foss Aff. ¶ 9, 10. Because the account receivable was deemed a "doubtful asset" by the FCA and East Central's own auditors, East Central removed it from its books in 1989. Pl.'s Mem., Salm Aff. ¶ 33; Def.'s Mem., Hilke Aff. ¶ 14, Bateman Aff. ¶ 4. At the same time, East Central initiated this lawsuit, seeking to recover the account receivable under various theories. The Bank moves for summary judgment on all counts.

DISCUSSION

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing*, 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

I. *The Contract Claims*

Defendant argues that plaintiff is not entitled to the $3.3 million financial assistance under either the 1986 or the 1987 agreement, and that defendant is therefore entitled to summary judgment on Counts 1 (breach of contract), 2 (declaratory judgment), 5 (injunctive relief), 7 (promissory and equitable estoppel) and 8 (conversion).

A. Has the 1986 Agreement Lapsed by Time and Performance?

Defendant asserts that plaintiff has no surviving contractual rights under the 1986 agreement because the agreement has lapsed by time and performance. Paragraph 1 of the agreement states that the Bank shall share in East Central's losses by "providing funds at any time between the date of execution of this Agreement and December 31, 1986 in that dollar amount that is necessary to maintain the surplus account of [East Central] at $100,-000." It is undisputed that the Bank did provide assistance before December 31, 1986 by recording an account receivable on plaintiff's books in an amount necessary to maintain East Central's surplus account at $100,000. Thus, defendant argues, it has fully performed the contract, and the contract has ceased to exist. *See In re Knutson*, 563 F.2d 916, 917 (8th Cir.1977) (all contracts are executory to some degree and

---

timony cited by plaintiff, viability was related to an institution's ability to meet federal capital adequacy requirements. *See* Pl.'s Mem., Foss Dep. at 131–33, Buegler Dep. at 45, Theuninck Dep. at 68, Kettering Dep. at 23–24, 59.

cease to be contracts when they cease to be executory).

Underlying defendant's interpretation of the 1986 agreement is its assertion that the "funds" to be provided under the agreement were to exist on paper only. The Bank maintains that the receivable was entered on East Central's books with the understanding that it would not be converted to cash unless East Central experienced a net charge-off of bad loans in excess of its pre-existing loan loss allowance. Def.'s Mem., Johnson Aff. ¶ 5. Thus, according to defendant, the receivables it entered on the books of plaintiff and other PCAs were temporary balance sheet adjustments, and were never intended to actually be paid. In the Bank's view, the obligation to provide the funds was temporary, was fully performed, and expired at the end of 1986.

East Central vigorously contests the Bank's reading of the 1986 agreement. East Central argues, first, that the plain meaning of the agreement requires the Bank to provide it financial assistance in cash. East Central notes that the Bank promised to provide "funds," which *Black's Law Dictionary* defines as "a sum of money or other liquid assets set apart for a specific purpose or available for the payment of debts or claims." Moreover, East Central argues, the obligation in the agreement is unqualified; there is no mention of assistance in the form of an account receivable. Finally, East Central argues that under the terms of the agreement, the only thing that expired was the continued accumulation of losses that the Bank agreed to share with East Central. The obligation to pay the account receivable already posted did not expire, and the Bank's performance is not complete until it cashes out the receivable.

East Central maintains that the extrinsic evidence also supports its reading of the agreement. East Central asserts that the Bank assured East Central that the account receivable was an irrevocable asset (Pl.'s Mem., Salm Aff. ¶ 14), told its own auditors that the financial assistance was a direct grant to East Central (Pl.'s Mem., Ex. 53, 59), and represented to the FCA that it had the resources to pay the assistance (Pl.'s Mem., Ex. 21). In addition, East Central argues that the accounting treatment of East Central's account receivable and of the Bank's account payable reveal that the Bank's intent was to provide actual cash assistance, not a mere bookkeeping prop. Under GAAP, plaintiff argues, an account payable is an actual obligation to transfer funds; the obligation is fixed as a result of past transactions or events, and carries no contingencies of payment. Pl.'s Mem., Akason Aff. ¶ 6, 8, 13. Plaintiff maintains that in order to have the account payable approved by the Bank's auditors, Bank management must have represented that the account payable was a fixed obligation. By approving the Bank's financial statements, the auditors attested to that representation. *Id.* ¶ 3, 7, 9. East Central makes a similar argument regarding the recording of the account receivable on its own books. The Bank itself recorded the receivable on East Central's books. Plaintiff contends that in recording the financial assistance as an account receivable, the Bank represented that the financial assistance was a non-contingent economic benefit obtained because of past transactions, and the Bank's auditors attested to this representation.[5] Pl.'s Mem., Akason Aff. ¶ 15, 16, 18. Finally, plaintiff points to defendant's treatment of its own inter-district loan sharing agreements as evidence of defendant's intent regarding the 1986 agreement. Defendant states that the 1986 agreement was modeled on the inter-

---

**5.** In its memorandum, defendant asserts that the account receivables were bona fide receivables in accounting terms because when they were recorded, everyone thought the receiving banks would suffer losses matching the reserve accounts. Def.'s Mem. at 7. As plaintiff notes, the authority the Bank cites for this proposition says only that the accounting treatment was in accordance with GAAP; it does not explain why.

In its reply, defendant does not contest plaintiff's specific testimony about the nature of bona fide account receivables under GAAP, but asserts that the auditors and accountants were struggling to record the novel farm credit transactions in conventional terms. Defendant produces no testimony or other evidence to back up this claim.

district agreements. Def.'s Mem. at 6–8. Plaintiff asserts, and defendant does not dispute, that in litigation to enforce payment of account receivables entered on its own books, the Bank took the position that it was entitled to cash payment as soon as the account receivable was recorded.

■ In interpreting a contract provision, a court must look first to the plain meaning of the contract terms; if those terms are ambiguous and their construction depends upon extrinsic evidence, a question of fact arises that ordinarily must be decided by a jury. *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 67 (Minn. 1979). Thus, plaintiff correctly notes that where the determination of the parties' intent depends upon extrinsic evidence, summary judgment is ordinarily not appropriate, because the parties should have a full opportunity to present evidence to clarify the unclear terms. *Matter of Turners Crossroad Development Co.*, 277 N.W.2d 364, 368–69 (Minn.1979). Summary judgment may nonetheless be appropriate, however, where the ambiguity arises from the arguments of the parties rather than from the terms of the document and where the relevant external evidence is undisputed. *Id.* at 369.

■ The ambiguity in the 1986 agreement does not arise from the terms of the agreement but from defendant's contention that the funds to be provided under the agreement were intended to be temporary and contingent on plaintiff charging off bad loans. On its face, the agreement gives no hint of this understanding. As plaintiff points out, the contract terms are absolute, stating that defendant will "share in losses" by "providing funds" within a specified time frame. The fact that those funds were in fact provided within the specified time frame indicates that the condition precedent to their payment—East Central's incurring losses—had occurred. Moreover, the agreement does not obligate East Central to pay back any of the funds provided, nor does it suggest that the funds will be provided subject to any contingency. Absent such provisions, the agreement's end date of December 31, 1986 cannot be read as releasing defendant from its obligation, thereby entitling it to remove from East Central's books the funds that defendant had advanced. Rather, the end date merely cuts off the Bank's obligation to provide additional funds after December 31, 1986.

■ The only way to read the end date as canceling the Bank's obligation to pay plaintiff the funds represented by the account receivables posted before December 31, 1986 is to read into the agreement a contingency that does not appear on the face of the document. The Bank's argument that East Central's rights under the 1986 agreement have lapsed by time and performance flies only if the Bank is correct in its contention that the parties intended the account receivable to represent the potential that assets would be transferred in the future, rather than the actual transfer of those assets. To support this view, the Bank offers the testimony of its officers regarding their intent of the agreement. In response, East Central offers the testimony of its officers stating that they did not view the agreement in that way, evidence of the meaning of account receivables under accounting principles, and evidence that the Bank interpreted similar agreements providing it with account receivables as transferring actual funds. East Central's evidence raises a genuine issue of fact regarding whether the parties intended the account receivable to function as an actual transfer of funds or a potential transfer of funds. Therefore, defendant cannot win summary judgment on the grounds that East Central's rights under the 1986 agreement have expired through time and performance.

B. Has the 1986 Agreement Been Superseded by the 1987 Agreement?

However, the Bank argues that, even if plaintiff were entitled to cash assistance under the 1986 agreement, that agreement was superseded by the 1987 agreement, which conditions the payment of cash assistance on plaintiff charging off bad loans. The Bank notes that the 1987 agreement refers to the outstanding financial assistance, provides the terms under which the assistance will be continued, and sets forth

the conditions upon which the assistance will be converted to cash. Moreover, the Bank points out that paragraph 9 of the 1987 agreement provides:

> This Agreement, together with all Exhibits, Schedules, and attachments hereto constitutes the entire Agreement between the parties and supersedes all previous agreements, promises, and representations, whether written or oral, between the parties with respect to the subject matter hereof.

Thus, the Bank continues, the 1987 agreement is either an integration of all prior written and oral agreements or an amendment to the 1986 agreement which controls every aspect of the financial assistance and which therefore completely discharges the 1986 agreement.

East Central does not contest defendant's assertion that the 1987 agreement could, by its terms, function as an integration or amendment that supersedes and discharges the 1986 agreement. Rather, it maintains that the Bank is barred from enforcing the agreement by the doctrine of equitable estoppel and by the preexisting duty rule.

### 1. Does the Doctrine of Equitable Estoppel Preclude the Bank from Enforcing the 1987 Agreement?

■ The Minnesota Supreme Court has defined estoppel as an equitable doctrine intended to prevent a party from taking unconscionable advantage of its own wrong by enforcing its strict legal rights. *Northern Petrochemical Co. v. U.S. Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn.1979). A party seeking to invoke the doctrine must prove that "defendant made representations or inducements, upon which the plaintiff reasonably relied, and that plaintiff will be harmed if the claim of estoppel is not allowed." [6] *Id.* Whether the elements of estoppel exist depends upon the facts of each case. *Id.* at 410; *see also Mason v. Spiegel, Inc.*, 610 F.Supp. 401, 403 (D.Minn.1985). East Central argues that the Bank must be estopped from enforcing the 1987 agreement because it falsely represented that the agreement merely capped its obligations under the 1986 agreement.[7]

■ The parties agree that whether the Bank made inducements or representations is a disputed question of fact. The Bank asserts, however, that even if its officers did represent that the 1986 agreement merely capped its obligation, East Central cannot meet the second element of the *Northern Petrochemical* test, because it was not reasonable for East Central to rely on those oral representations in the face of contradictory contractual language. As the Bank points out, a party may not claim

---

**6.** Having cited this rule, East Central goes on to assert that the burden should be shifted to the Bank to show that the agreement was valid, because a relationship of trust and confidence existed between the parties. Pl.'s Mem. 41–42. In making this argument, East Central relies on *Gartner v. Gartner*, 246 Minn. 319, 74 N.W.2d 809, 813 (1956). *Gartner* involved allegations of fraud in the context of antenuptial agreements. The Minnesota Supreme Court stated that, although the party seeking to invalidate an agreement ordinarily bears the burden of establishing fraud, a presumption of fraud could arise where the parties stood in a confidential relationship and there was inadequate consideration for the agreement. Where those two requirements were met, the burden shifts to the party seeking to uphold the agreement to show that it is valid.

The Court is not convinced that plaintiff has established a confidential relationship under *Gartner;* the financial relationship of two banks is inherently different from a marital relationship. Even if the plaintiff could meet the re-

quirement of a confidential relationship, however, it has not established that consideration for the 1987 agreement was lacking. As defendant notes, the 1987 agreement provided plaintiff with an $80 million line of credit. Thus, plaintiff is not entitled to rely on a presumption of fraud in attacking the 1987 agreement.

**7.** East Central also argues that the Bank should be estopped from enforcing the agreement because it coerced East Central to sign the agreement by incorporating the provisions into the general financing agreement and by denying East Central the opportunity to negotiate or consult independent legal counsel. However, as defendant notes, under Minnesota law duress is a defense to contract formation only when the agreement is coerced by physical or unlawful threats; Minnesota does not recognize a cause of action for financial duress. *Bond v. Charlson*, 374 N.W.2d 423, 428 (Minn.1985); *St. Louis Park Investment v. R.L. Johnson Investment*, 411 N.W.2d 288, 291 (Minn.Ct.App.1987).

fraudulent inducement by promises that are directly contradicted by a subsequently executed agreement, absent some factor justifying the party's reliance. *Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 828–29 (D.Minn.1989) (citations omitted).

■ Paragraph 4 of the 1987 agreement states that "the conversion of any financial assistance being carried as an account receivable ... on the PCA's financial statement into cash ... will be determined by the process documented in 'Exhibit B.'" Thus, by its terms, the agreement did not merely limit the Bank's obligation to financial assistance already outstanding; it defined the terms upon which the account receivable would be converted to cash. Moreover, paragraph 9 of the agreement is an integration clause, providing that the agreement "supersedes all previous agreements, promises, and representations, whether written or oral, between the parties." The Court concludes that East Central was not justified in relying on representations that the agreement only capped the amount of financial assistance, when that reading of the agreement is clearly contradicted by the contract terms.[8] Because plaintiff cannot establish that it justifiably relied on the Bank's alleged representations, the Bank will not be estopped from enforcing the 1987 agreement.

### 2. Does the Pre–Existing Duty Rule Preclude the Bank from Enforcing the 1987 agreement?

■ East Central also argues that the pre-existing duty rule precludes the Bank from enforcing the 1987 agreement. The pre-existing duty rule is a common law doctrine holding that if a party promises to do what he is already obligated to do, there is insufficient consideration to support the promise. *Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723, 728 (Minn.1985). However, Minnesota has rejected the pre-existing duty rule, in favor of a rule providing that "[p]arties can alter their contract by mutual consent, and this requires no new consideration, for it is merely the substitution of a new contract for the old one, and this is of itself a sufficient consideration for the new." *Olson v. Penkert*, 252 Minn. 334, 90 N.W.2d 193, 203 (1958). As defendant notes, the Minnesota Supreme Court reaffirmed this rule in *Bond v. Charlson*, 374 N.W.2d 423, 429 (Minn.1985). Thus, plaintiff cannot rely on the pre-existing duty rule to invalidate the 1987 agreement.

### C. Is the Plaintiff Entitled to Cash Conversion of the Receivable Under the 1987 Agreement?

■ Because the 1987 agreement is an enforceable agreement that integrated and superseded the 1986 agreement, plaintiff can recover only if the 1987 agreement entitles it to cash. The Bank contends that the conversion formula in the 1987 agreement does not allow East Central to convert its account receivable to cash. The formula provides that the amount of financial assistance converted to cash (FA paid) would equal "the financial assistance given (FA) times the net chargeoff (NCO) divided by the total provision *added* (PROV) during the periods when the financial assistance was provided." (Emphasis added.) In equation form, the formula is expressed as: $FA(PAID) = FA * (NCO/PROV)$. "PROV" is further defined as "the *cumulative* provision for loan and acquired property loss expense during period assistance was booked as a receivable." (Emphasis added.)

The Bank argues that, by its terms, the formula required the plaintiff to add to its provision expense in order to qualify for cash conversion. However, from the time the receivable was booked in May 1986 to the time it was removed in October 1989, East Central did not add to its provision

---

**8.** There are circumstances in which a party may justifiably rely on representations that contradict contract language; for example, *Carlock* suggests that having no opportunity to read an agreement could justify relying on contradicting oral representations. *See Carlock*, 719 F.Supp. at 824 (citing *Zobrist v. Coal–X, Inc.*, 708 F.2d 1511, 1518 (10th Cir.1983)). East Central has not identified any factors justifying its reliance. As defendant points out, East Central received the agreement several days before it was executed, and its chief executive officer read it before signing it. Def.'s Mem., Foss.App. ¶ 6; Hilke Supp. Aff. ¶ 3.

expense; instead, it reversed earlier provision expenses. Def.'s Mem., Engel Aff. ¶ 13. Thus, defendant argues, East Central has not met the condition precedent to cash conversion: cumulative provision expenses.

This reading of the formula is supported, the Bank asserts, by the fact that the financial assistance was intended to help East Central avoid stock impairment and regulatory insolvency. The Bank argues that the fact that East Central reversed earlier provision expenses indicates that it has experienced some degree of economic recovery; to read the formula to permit cash conversion during economic recovery is contrary to the purpose of the financial assistance.

In response, plaintiff asserts that the formula entitles it to full recovery of the account receivable. The formula provides for cashing out a percentage of the account receivable; the percentage is determined by calculating the ratio of charged-off loans to the provision expenses added to the plaintiff's books while the account receivable was in place. Apparently, plaintiff reads the formula to permit the addition of a negative provision expense. As negative provision expenses are added and the provision expense approaches zero, the percentage derived from the ratio of charge-offs to provision expenses increases. Thus, under East Central's reading, an institution that reversed its provision expense would be entitled to a larger cash conversion than an institution whose provision expense remained stable. East Central does not address the Bank's argument that this result is contrary to the intended purpose of the financial assistance; rather, it argues that the formula should be strictly construed against the Bank, which drafted the formula.

The Court concludes that the defendant's reading of the formula is correct, for four reasons. First, the reference to adding appears not in the mathematical expression of the formula, but in the narrative description of the formula element "PROV," which states that PROV is the "total provision added . . . during the periods when the financial assistance was provided." As a matter of arithmetic, a negative number can be "added" to reduce the provision expenses under the formula. In context, however, the Court believes that the term "added" carries its common meaning of "increased," rather than its technical mathematical meaning. This reading is reinforced by the fact that the formula further defines "PROV" as the "cumulative" provision for loan and property losses. Second, the agreement includes an example of a calculation under the formula; that calculation shows an increase in provision expense resulting in a partial cash-out. Third, paragraph 4 of the agreement states that "the purpose of [the financial assistance] was to prevent the impairment of [East Central's] outstanding capital stock." It is unlikely that an agreement intended to improve the plaintiff's financial position would provide for cashing out the financial assistance if East Central's position improved, but not if it remained stable.

Finally, East Central has not submitted evidence sufficient to rebut the Bank's showing that the formula does not entitle East Central to cash conversion. Plaintiff's brief does not set out the calculations underlying its claim that the formula entitles it to full cash conversion; instead, plaintiff points to two pieces of evidence that it maintains support its claim of full recovery. Pl.'s Mem. at 19, a 46. The first, Exhibit 33, is a memorandum written by the Bank's senior vice president of finance stating that if provision expense reversals were used in calculating the percentage relationship between net charge-offs and provision expenses, a PCA could qualify for cash conversion without experiencing charge-offs. The memorandum does not state that this reading of the formula would entitle East Central to cash conversion. Nor does the second piece of evidence, Exhibit 61, demonstrate that East Central is entitled to recovery; rather, Exhibit 61 is a table of figures that does not explain the application of the formula.

In any event, the Court fails to see how plaintiff's reading of the formula can support full recovery of the account receivable. The formula provides for cash conversion

at a percentage determined by the ratio of loan charge-offs to provision expenses. Thus, it sets up a fraction, the numerator of which is the charge-offs, and the denominator of which is the provision expense. In order to yield a full cash conversion, that fraction would have to establish a percentage of 100 percent. Adding negative provision expenses would reduce the denominator of the fraction, thereby increasing the percentage, but the percentage would not become 100 percent unless the loan charge-offs and the provision expense were equal. Plaintiff has submitted no evidence showing that these two figures were equal, and thus entitled it to convert 100 percent of its account receivable to cash.

Because the Bank has proffered evidence showing that East Central is not entitled to cash conversion under the formula, and because East Central has not proffered sufficient evidence rebutting the Bank's showing, the Court holds that the Bank is entitled to summary judgment on the issue of whether it owes East Central cash under the 1987 agreement.[9]

## II. *The Estoppel and Misrepresentation Claims*

■■■■■ Count 7 of the plaintiff's complaint asserts a cause of action based on promissory and equitable estoppel. Count 10 of the complaint asserts a cause of action based on misrepresentation. The Bank contends that as a matter of law, East Central cannot establish the elements of detrimental reliance or damages which are necessary to these counts. As noted above, a party seeking to invoke the doctrine of equitable estoppel must prove that (1) the defendant made representations or inducements; (2) the plaintiff reasonably relied upon the representations; and (3) the plaintiff will be harmed if estoppel is not allowed. *Northern Petrochemical*, 277 N.W.2d at 410. Similarly, to claim promissory estoppel a party must prove that (1) a promise was made; (2) the promisor should reasonably have expected the promise to

induce actions of a definite and substantial character; (3) the promise did in fact induce such action; and (4) the circumstances require the enforcement of the promise to avoid injustice. *AFSCME Counsels 6, 14, 65, and 96 v. Sundquist*, 338 N.W.2d 560, 568 (Minn.1983). Elements 3 and 4 are sometimes referred to collectively as "detrimental reliance." *See id.* Misrepresentation, too, contains the elements of reasonable reliance and damages. *Hanson v. Ford Motor Co.*, 278 F.2d 586 (8th Cir. 1960).

■■■■ In arguing for summary judgment on the estoppel and misrepresentation claims, defendant asserts that even if its officers did misrepresent that the account receivable was a permanent asset subject to cash conversion, East Central did not rely on the representations to its detriment. As evidence of that, the Bank points to East Central's 1987 annual report and its 1988 quarterly reports, which stated that there were uncertainties as to the methods, timing and amount of payment of the account receivable and that it was therefore impossible to determine at what amount the receivable would be realized. Def.'s Mem., Hilke Aff. ¶ 18.

In addition, the Bank argues that East Central has pointed to no damages flowing from the alleged misrepresentations. East Central points to three acts which it undertook in detrimental reliance on the Bank's statements. First, East Central claims that, in reliance on the account receivable as an irrevocable asset, it converted its member stock from protected stock to at-risk stock. Pl.'s Mem., Salm Aff. ¶ 36. If the account receivable is withdrawn and if as a result of that withdrawal East Central does not survive, its members will lose their equity investment; thus, East Central argues, withdrawal of the assistance will undermine its borrower's confidence and "virtually ensure the destruction of East Central as a lending institution." Pl.'s Mem. at 49.

---

9. The Bank also contends that even if East Central were entitled to cash conversion under the formula, its recovery is barred by its material breaches of the 1987 agreement. However, because the 1987 agreement does not entitle East Central to cash conversion, the Court need not address whether East Central's alleged breaches preclude it from enforcing the agreement.

In response, the Bank points out the undisputed fact that the account receivable was removed from the books in December 1989 and that East Central announced the loss in its 1989 third quarter report to its shareholders. If the withdrawal of assistance was destined to destroy East Central, defendant argues, plaintiff should be able to set forth some evidence of membership erosion, which it has not done.

Second, East Central claims that in reliance on the account receivable, it did not apply for direct assistance from the FAB. Pl.'s Mem., Salm Aff. ¶ 39. It asserts that "there is every reason to believe that the FAB would have approved a request for financial assistance in 1987 or 1988." Pl.'s Mem. at 50. However, East Central has offered no evidence to support the assertion that it would have received assistance had it applied to the FAB. Moreover, in February 1989, defendant proposed making a joint application to the FAB for financial assistance, and plaintiff responded that a joint request would be "inappropriate." Def.'s Mem., Hilke Aff. ¶ 12.

Finally, East Central claims that in reliance on representations that the receivable was an asset that it irrevocably owned, it engaged in an aggressive program of restructuring its loans. Pl.'s Mem., Salm Aff. ¶ 38. As a result, plaintiff argues, it took on financial risks and costs it otherwise would not have incurred. To support this contention, plaintiff submits affidavit testimony indicating that although the loan restructuring program improved East Central's risk positions, it increased its operating costs. Pl.'s Mem., McCance Aff. ¶ 6. However, defendant maintains, and plaintiff does not dispute, that plaintiff's loan restructuring program has improved its net income and its overall financial position. Def.'s Mem., Johns Aff. ¶ 9.

The Court concludes that East Central has failed to come forth with sufficient evidence of detrimental reliance to survive summary judgment on its estoppel and misrepresentation claims. East Central's own expert testifies that, while plaintiff's financial condition remains difficult (Pl.'s Mem., McCance Aff. ¶ 8), its condition has im-proved since 1986 and its present five-year plan projects that it will remain viable. *Id.* ¶ 5, 9. Any detriment that it has suffered remains speculative: plaintiff has submitted no evidence that membership confidence has eroded, that it could have obtained funds from the FAB had it applied for them, or that the reversal of the account receivable two years ago has destroyed it as a lending institution. Instead, East Central has submitted testimony that its ability to remain viable over the next five years depends upon its ability to make guaranteed loans, that it therefore has an important need to increase its loanable equity, and that its loanable equity would increase with direct cash assistance from the bank. *Id.* at 9, 10. Rather than establishing that the withdrawal of financial assistance has hurt it, East Central seems to argue that returning that assistance would help it. Because East Central has not produced evidence that reliance on defendant's alleged representations has caused it detriment, the Court will grant summary judgment for the Bank on the estoppel and misrepresentation claims.

### III. *The Breach of Fiduciary Duty Claims*

Counts 9 and 11 of the plaintiff's complaint assert that the Bank has breached a fiduciary duty it owed to plaintiff as a shareholder in the Bank. In its memorandum, plaintiff expands this theory to argue that the fiduciary duty arises not only from the fact that it owns stock in the Bank, but also from the confidential relationship between the parties and from the fact that the Bank provided legal advice to plaintiff regarding the 1987 agreement. The defendant argues that, as a matter of law, it owes no fiduciary duty to the plaintiff and that it is therefore entitled to summary judgment on the fiduciary duty claims.

#### A. Does Defendant Owe a Fiduciary Duty to Plaintiff as a Shareholder?

East Central makes a novel argument that the Bank owes it, as a shareholder, a fiduciary duty. East Central asserts that the Bank's officers owe a fiduciary duty to

the Bank's shareholders, including East Central, and that because the Bank's alleged misconduct occurred through the actions of its officers and directors, the Bank is liable to East Central for the officers' breach of fiduciary duty under the doctrine of respondeat superior. The only authority East Central cites for this theory is *Jordan v. Global Natural Resources*, 564 F.Supp. 59, 68 (S.D.Ohio 1983).

In *Jordan* the court expressly held that "a corporation as an entity has no fiduciary duty to its shareholders as a matter of law." *Id.* Rather, officers and directors owe a fiduciary duty to the corporation, and the shareholder of the corporation may in some instances sue to enforce that duty. The court went on to note, however, that since a corporation could be held liable for acts of its agents through the doctrine of respondeat superior, it was "conceivable" that a shareholder could recover against a corporation by establishing that the directors, acting within their authority, breached a duty owed to the corporation. *Id.*

 Even if the Court were to adopt the theory proposed (but not adopted) by the *Jordan* court, plaintiff has not stated a cause of action based on a fiduciary duty owed to it as a shareholder in the Bank. To assert a breach of fiduciary duty claim against a corporate officer or director, a shareholder must point to a duty owed the corporation (in this case, the Bank). East Central, however, alleges that the Bank had a duty to pay East Central funds, to avoid misrepresenting the 1987 agreement, or to disclose to East Central its true position on the account receivable. Assuming the Bank's officers and directors engaged in this misconduct, they did not breach a duty owed to the *Bank;* instead, they breached a duty allegedly owed to East Central. In addition, East Central has presented no evidence and made no argument that the directors or officers were acting within their authority when they engaged in the alleged misconduct. Therefore, the Court holds that plaintiff may not assert a cause of action based on a fiduciary duty owed to it as a shareholder.

### B. Does Defendant Owe a Fiduciary Duty to Plaintiff Because it Provided Plaintiff with Legal Advice?

 East Central also argues that a fiduciary relationship arose between it and the Bank because the Bank provided it with legal counsel. In making this argument, East Central cites a legal malpractice case for the proposition that a fiduciary duty may arise whenever an attorney provides advice to a client. *See Veit v. Anderson*, 428 N.W.2d 429 (Minn.Ct.App.1988). East Central then asserts that the Bank's in-house legal department advised East Central regarding the terms and conditions of the financial assistance. Thus, plaintiff argues, the Bank is liable for its attorneys' breach of their fiduciary duty under the doctrine of respondeat superior.

As an initial matter, the Court notes that *Veit* does not discuss fiduciary duties, but rather states that when an attorney gives advice to a person, an attorney-client relationship may arise that could render the attorney liable under a tort theory. *Id.* at 432. In any event, East Central has not pointed to any facts supporting its argument that an attorney-client relationship existed between it and the Bank's legal staff. Indeed, while it asserts in its memorandum that the Bank's legal staff advised it regarding the terms of the financial assistance (Pl.'s Mem. at 47), it points to no evidence supporting this assertion. Therefore, the Court holds that plaintiff may not assert a cause of action based on a fiduciary duty owed it by the Bank's legal staff and imputed to the Bank through the doctrine of respondeat superior.

### C. Does Defendant Owe a Fiduciary Duty to Plaintiff Arising out of a General Relationship of Trust and Confidence?

 Finally, East Central argues that because the relationship between it and the Bank was one of trust and confidence, the Bank owed it a fiduciary duty. Under Minnesota law, "[a] fiduciary relation[ship] exists when confidence is reposed on one side and there is resulting superiori-

ty on the other; and the relation[ship] and duties in it need not be legal but may be moral, social, domestic, or merely personal." *Midland National Bank v. Perranoski*, 299 N.W.2d 404, 413 (Minn.1980) (quoting *Stark v. Equitable Life Assurance Society*, 205 Minn. 138, 285 N.W. 466, 470 (1939)). Factors such as disparity in business experience and greater access to facts and legal resources may give rise to a fiduciary relationship, if they are combined with a confidential relationship. *Minnesota Timber Producers v. American Mutual Ins.*, 766 F.2d 1261, 1267 (8th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 801, 88 L.Ed.2d 778 (citing *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn.1985)). However, "a fiduciary relationship is not established ... by plaintiff merely having faith and confidence in defendant where plaintiff should have known defendant was representing an adverse interest." *So. Minn. Municipal Power v. St. Peter*, 433 N.W.2d 463, 468 (Minn.Ct.App.1988) (citing *Kennedy v. FloTronics, Inc.*, 143 N.W.2d 827, 830 (Minn.1966)). While the existence of a fiduciary relationship is generally a question of fact, this does not preclude the Court from resolving the issue on summary judgment if the undisputed facts establish that no fiduciary duty exists. *Minnesota Timber Producers*, 766 F.2d at 1268.

■■■■ The Court concludes that under these standards, the dealings between East Central and the Bank did not give rise to a fiduciary relationship. While the nature of the Farm Credit System undoubtedly renders the relationship between East Central and the Bank different from relationships between commercial lenders outside the system, the fact remains that both East Central and the Bank are sophisticated financial institutions with separate management staffs and boards of directors. Both East Central and the Bank are federally chartered, private lending institutions, subject to ordinary principles of contract law. *Amarillo Production Credit Ass'n v.*

*Farm Credit Admin.*, 887 F.2d 507, 508 (5th Cir.1989).

East Central itself emphasizes that its relationship with the Bank is defined by contracts which govern everything from the amount of money the Bank will provide and the interest rate at which it will provide it to the provision of administrative services such as accounting and bookkeeping. Pl.'s Mem. at 6, 31; Bateman Dep. at 112; Johnson Dep. at 48–53. Given this context of contractual dealings, plaintiff cannot have been unaware that the Bank had interests different from, and possibly adverse to, East Central's.[10] Thus, even if plaintiff did place complete trust in the Bank, that fact alone does not give rise to a fiduciary duty under Minnesota law. *So. Minn. Municipal Power v. St. Peter*, 433 N.W.2d at 468; *see also Minnesota Timber Producers*, 766 F.2d at 1268 (mere fact that plaintiff employer association trusted defendant insurance company with whom it contracted does not transform relationship into a fiduciary one).

## IV. *The Claim under 12 C.F.R. § 614.-4341*

Count 3 of plaintiff's complaint asserts a cause of action based on 12 C.F.R. § 614.-4341, which provides:

> No institution shall reverse any financial assistance provided under ... any ... capital preservation/loss-sharing program that was received or accrued prior to July 1, 1986.

The Bank argues that no private right of action exists under the regulation and that it is therefore entitled to summary judgment on Count 3.

■■■■ The Farm Credit Act, under which 12 C.F.R. § 614.4341 was promulgated, does not explicitly provide for a private cause of action. The United States Supreme Court has established a four-part test to determine whether a private cause of action should be implied for violations of

---

**10.** Indeed, plaintiff points out that the financing agreements that the Bank entered into with each PCA were not uniform, but carried different terms and interest rates. Pl.'s Mem. at 6, 7; Salm Aff. ¶ 6. As an entity responsible for doling out a limited supply of wholesale funds to numerous PCAs under various terms, defendant's interests obviously could not coincide with plaintiff's in all respects.

federal law: first, whether the statute creates a federal right in favor of the plaintiff; second, whether there is any indication of congressional intent to create or deny a private remedy; third, whether a private remedy is consistent with the underlying purposes of the legislative scheme; and fourth, whether the cause of action is traditionally relegated to state law. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). The most significant of these factors is whether there is an indication of congressional intent. *See Hofbauer v. Northwestern National Bank of Rochester,* 700 F.2d 1197, 1200 (8th Cir.1983) (in determining whether to imply a private cause of action, the Supreme Court looks almost exclusively to congressional intent).

■ Both this Court and the Eighth Circuit have held that no private cause of action exists under the Farm Credit Act. *Eurle Farms v. Farm Credit Services of St. Paul,* 928 F.2d 274 (8th Cir.1991); *Zajac v. Federal Land Bank of St. Paul,* 909 F.2d 1181 (8th Cir.1990); *Springwater Dairy v. Federal Intermediate Credit Bank,* 625 F.Supp. 713 (D.Minn.1986). Plaintiff distinguishes its claim from those involved in earlier cases on the ground that they did not involve disputes between credit institutions. Plaintiff does not, however, address why this difference should lead the Court to imply a private cause of action in the face of controlling precedent to the contrary, nor does it apply the *Cort v. Ash* factors. Because the plaintiff has not established that it has a viable cause of action under 12 C.F.R. § 614.4341, the Court will grant summary judgment for defendant on Count 3.

## V. *The Third–Party Beneficiary Claim*

In Count 6 of its complaint, East Central asserts a claim as a third-party beneficiary of the contract by which the FAB provided financial assistance to the Bank. However, section 34 of that agreement provides that "[n]o rights or benefits are intended to be created hereunder for the benefit of any party other than the St. Paul FCB, the FAC, the FCA, and the Assistance Board." Def.'s Mem., Collins Aff., Ex. F ¶ 34. The

Bank argues that because it and the FAB specifically stated that they intended their agreement to benefit no third parties, it is entitled to summary judgment on Count 6.

■ Under Minnesota law, a third party may recover as an intended beneficiary if recognition of third party rights is "appropriate" and either the duty-owed test or the intent-to-benefit test is met. *Cretex Companies, Inc. v. Construction Leaders, Inc.,* 342 N.W.2d 135, 139 (Minn. 1985) (adopting Restatement (Second) of Contracts § 302 (1979)). East Central does not attempt to show that either of these tests has been met, nor does it address the contract language specifically disclaiming third-party claims. Rather, it asserts that "[w]hether or not [the agreement between the Bank and the FAB] gives rise to an express cause of action, the contract creates duties on the part of the Bank that require judicial enforcement." Pl.'s Mem. at 52. As defendant notes, it appears that East Central has conceded that it is not an intended beneficiary. The Court will therefore grant the Bank summary judgment on the third-party beneficiary claim.

## VI. *The Mandamus Claim*

■ Count 4 of the plaintiff's complaint asserts a claim for mandamus. Plaintiff asserts that this claim is "based upon the common-law rights of any shareholder to have a corporation carry out its duties." Pl.'s Mem. at 52. Plaintiff does not detail its claim, but merely cites *Fownes v. Hubbard Broadcasting, Inc.,* 302 Minn. 471, 225 N.W.2d 534 (1975). In *Fownes,* the Minnesota Supreme Court held that the remedy of mandamus was available to enforce a shareholder's statutory right to inspect corporate books and records. The court noted that the statute establishing a shareholder's right to inspect corporate records derived from common law. Nowhere did the court refer to a shareholder's general common law right to have a corporation carry out its duties. Because the plaintiff has proffered no legal authority supporting its claim for mandamus, the Court will grant defendant summary judgment on Count 4.

**612**

Accordingly, based upon the foregoing, and upon all the files, records and proceedings herein,

IT IS ORDERED that defendant's motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.