## WESLEY A. SILVERNESS v. BEATRICE E. SILVERNESS.

134 N. W. (2d) 901.

April 9, 1965—No. 39,362.

*Martini, Harper & Gustafson* and *James Harper*, for appellant.
*Leo J. Burak* and *Alfred J. Weinberg*, for respondent.

THOMAS GALLAGHER, JUSTICE.

This is an appeal from an order wherein plaintiff, Wesley A. Silverness, was given judgment for a divorce from defendant, Beatrice E. Silverness. The order dated December 6, 1963, was based in part upon the following finding:

"That defendant, disregarding her duties as a wife, willfully deserted said plaintiff in the year 1951 and has ever since that time and for more than one year immediately preceding the commencement of this action, uninterruptedly continued said desertion without cause on the part of this plaintiff." See, Minn. St. 518.06.

The decree denied defendant alimony but directed that plaintiff pay to the Department of Public Welfare of the State of Illinois a certain sum owing for hospital services rendered to defendant prior to October 15, 1963. In addition, it awarded plaintiff the homestead of the parties in Duluth, certain furniture and household goods therein, and a 1955 Chrysler automobile. It further awarded plaintiff some 30 acres of unimproved land in St. Louis County and directed that he

pay $150 for attorney's fees incurred by the defendant. In a memorandum attached to the order for judgment, the trial court stated:

"It appears from the evidence that the defendant, Beatrice E. Silverness, showed some symptoms of mental disturbance as far back as 1950 * * *. In 1951, on her physician's recommendation, she was hospitalized at St. Mary's Hill in Milwaukee, Wisconsin. Subsequent to her release from St. Mary's Hill, she went to live with her mother and brother in Chicago, Illinois, and never returned to reside with plaintiff.

"At that time, Thomas K. Silverness, the parties' minor son * * * was only twelve years of age. He was left with plaintiff who assumed his care and custody and he so lived with plaintiff until he went into the armed service.

"In July, 1953, plaintiff and his counsel, Leo J. Burak, arranged a conference with defendant and her brother * * * in Chicago * * * for the purpose of trying to persuade defendant to return to plaintiff and their home in Duluth. Defendant refused to do so * * *. It appears that during this period, off and on, that she did have some mental disturbance but the evidence does not show that she was so mentally disturbed that she was unable to make a choice of whether or not she wished to live with plaintiff. During this interval of separation, defendant indicated to plaintiff that she wanted a divorce.

"In April, 1957, without any notice * * * to plaintiff, defendant was committed to the Chicago State Hospital in Chicago, Illinois, and remained so committed to the time of the trial herein.

"Although the real estate in question was acquired during coverture and title to same was conveyed to parties as joint tenants, defendant did not contribute directly toward the purchase price and the title was so taken for convenience of the parties and at the direction of plaintiff. At the time the homestead was acquired, it was subject to a mortgage in excess of $7,000.00 which plaintiff has been paying on an amortized basis. Plaintiff still has a mortgage on said property in excess of $3,000.00."

On appeal it is defendant's contention that (1) the evidence does

not sustain a finding that defendant wilfully deserted plaintiff in the year 1951; (2) defendant is entitled to support from plaintiff; and (3) the award for attorney's fees is inadequate.

The evidence with respect to the issue of desertion disclosed the following: Plaintiff testified that in 1940 he and his wife moved from Chicago to Duluth where he has resided since that time; that in 1949 he bought a house in Duluth where he and his wife lived together until 1951; that in 1951, upon orders of her doctor, she was hospitalized at St. Mary's Hill in Milwaukee, Wisconsin, where she remained until December 1951; that when she left the hospital in Milwaukee she returned to Chicago to live with her mother and brother there; that she has not returned to Duluth where plaintiff is employed since that time; that plaintiff continued to care for the child of the parties since that date, at times employing a housekeeper to assist him therein; that on many occasions he has sought to induce defendant to return and live with him in Duluth; that in 1953, together with his attorney, he visited defendant in Chicago where he had conferences with her and with her brother and her doctor. With respect to such conferences, plaintiff testified:

"* * * I was pushed out of the picture completely; although I was married to my wife, I had no control over her at all. They seemed to want to take control * * *."

He further testified that his wife was present for a short time when he was conferring with the others but left before the conference was over; that when defendant left Milwaukee to go to Chicago in 1951 it was understood by both plaintiff and defendant that she was to be gone for only a few days; that he objected to her remaining longer in Chicago and desired that she return to Milwaukee to continue her treatments in the hospital and that while she was in Chicago she engaged in some private employment; that when he wrote to her relatives requesting that she return to Duluth or Milwaukee, such requests were ignored; that on one occasion when he visited her in Chicago she became abusive and engaged in a tirade against him, calling him names and becoming hysterical in his presence.

On cross-examination plaintiff testified that defendant's doctor in

Chicago had told him that it would be better for defendant's health if she did not return to Duluth; that she was improving and that her relatives would not agree to have her return to the hospital in Milwaukee.

Thomas K. Silverness, a son of the parties who was 22 years of age at the time of the trial, testified that he had visited his mother in Chicago at her brother's home; that after she had left Milwaukee he continued to live with his father and that at times his father's sister and his father's mother had assisted in the care of the household in Duluth, but that after he was older he and his father had lived there alone, aided by a woman to clean the house and take care of the laundry.

In a letter to plaintiff dated March 30, 1952, defendant wrote:

"You apparently prefer to believe that I am not serious about my intentions as expressed in my recent letters as you make no mention of the subject in the letter I received today. Please realize that I am going to get a divorce which naturally involves property settlements, custody of Tommy, etc. * * *

        *    *    *    *    *

"The decisions expressed in this letter are supported by past experience and much present deliberation. They also are positively concurred in by Dr. Kelleher who feels that contentment of all can be obtained only if we go our separate ways."

In a letter to her son dated April 10, 1953, defendant wrote:

"The lily plant [apparently sent to her by plaintiff] arrived & now reposes in the garbage can. Having seen many samples of my Tommy's shopping I suffer no delusions that the plant came from you. My Tommy never buys anything beyond his *own* income. * * * I have more money of my own than I have had in seventeen years, & I like it. * * *

"Write soon, darling—your father & your Aunt Jayne will find any false moves very unhealthy."

A letter from defendant's brother, with whom defendant resided in Chicago, to plaintiff's attorney in Duluth dated June 8, 1953, states:

"I am unable to understand exactly what Wes [plaintiff] wishes

\* \* \*. What does he want Bea [defendant] to do to prove to his satisfaction that she is fully aware of all the facts, that she is capable of making an intelligent decision and that her decision is as she has so constantly and consistently expressed it namely, she does not want to live with Wes? That this is an intelligent decision is supported by Drs. Haavik, and Kelleher and others, perhaps even including yourself. \* \* \*

"Sis works every day and seems to enjoy it as well as anyone likes work. She bought herself some nice summer dresses \* \* \*. She appears to be in excellent health. I don't agree with her at all times but that certainly is no indication that she needs hospitalization or medical care."

1. It seems too clear to require discussion that the evidence outlined is more than adequate to sustain the trial court's finding that defendant had deserted plaintiff in 1951 and that such desertion had been continuous for many years preceding commencement of plaintiff's action for divorce on the grounds of desertion. Minn. St. 518.06, subd. 5. His testimony is undisputed that after defendant left him he continually endeavored to induce her to return to Duluth or at least to the hospital in Milwaukee where she would be in "neutral" hands. The evidence is also clear that after defendant left Milwaukee and returned to Chicago she arrived at a "serious" decision never to return to plaintiff and expressed this to him in her letter of March 30, 1952. The fact that at times she was subject to mental disturbances or that some years later, in 1957, she was confined to a hospital for mental treatment would not detract from her determination in 1952 to leave plaintiff and obtain a divorce at a time when she had not been adjudged incompetent and when both she and her brother insisted she was rational. We have held that where insanity is pleaded as a defense in an action for divorce on the ground of cruelty it must be shown that the defendant was laboring under such a defect of reason as not to know the nature of his acts. Longbotham v. Longbotham, 119 Minn. 139, 137 N. W. 387. It would seem that this rule should also apply in actions for divorce on the grounds of desertion. In a number of jurisdictions it has been held that in an action for divorce

on the grounds of desertion where defendant was sane during the period required by statute to establish such desertion the fact that subsequently he was declared incompetent would not furnish a defense in the action. See, Annotation, 19 A. L. R. (2d) 171, § 11, and cases cited. Here it seems clear that the evidence falls short of establishing that from 1951 until 1957 defendant was laboring under such a defect of reason as not to know the nature of her acts in separating from plaintiff.

2. With respect to the court's denial of alimony to defendant and the award of the real property to plaintiff, we cannot say that in this case this constituted an abuse of judicial discretion. Defendant's brother testified that he had been left the entire estate of his mother with the understanding that he would take care of defendant during her lifetime from its proceeds. As manifested by his letter of June 8, 1953, he had acquiesced in defendant's decision to remain separated from plaintiff and to seek a divorce. For years defendant contributed nothing to the marriage relationship of the parties and maintained a separate and independent economic status. Perhaps for this reason the trial court felt that plaintiff should not be burdened further with her care and maintenance, and such determination in our judgment would not indicate an arbitrary exercise of its discretionary power therein.

Likewise, we find no abuse of discretion in the court's award to the plaintiff of the real property above described. Its total value was approximately $9,000, which would not appear to overcompensate plaintiff for the many years expended in acquiring it while caring for his son. See, Johnson v. Johnson, 250 Minn. 282, 84 N. W. (2d) 249; Baskerville v. Baskerville, 246 Minn. 496, 75 N. W. (2d) 762; Krusemark v. Krusemark, 232 Minn. 416, 46 N. W. (2d) 647; Potter v. Potter, 224 Minn. 29, 27 N. W. (2d) 784.[1]

---

[1]Minn. St. 518.58 provides: "Upon a divorce for any cause * * * the court may make such disposition of the property of the parties acquired during coverture as shall appear just and equitable, having regard to the nature and determination of the issues in the case, the amount of alimony * * * if any, awarded in the judgment, the manner by which said property was acquired and the persons paying or supplying the consideration therefor * * * and all the facts and circumstances of the case."

3. Finally, with respect to the award of $150 for defendant's attorney's fees, we cannot say that this was so grossly inadequate as to establish an abuse of judicial discretion. 6 Dunnell, Dig. (3 ed.) § 2804. However, we feel that counsel for defendant has ably represented her on this appeal and should be awarded additional fees in connection therewith. Accordingly, plaintiff is directed to pay to him the additional sum of $350 as attorney's fees on this appeal.

Affirmed.