ANDERSON, Justice (dissenting).
The court holds that the district court erred by valuing a marital asset as of the valuation date, as the dissolution statutes require, rather than following the court's newfound rule for classifying proceeds from the sale of a marital asset. Although the district court concluded that respondent Gretchen Zwakman Gill (wife) received her full marital share of the marital asset as of the valuation date-$27 million-the court concludes that she also is entitled to future, contingent earn-out payments, as set forth in a purchase agreement signed after the valuation date, even though the district court found that any earn-out payments would be the result of appellant Francis Stephen Gill's (husband) significant postmarital efforts to "grow the company beyond its value at the time of sale." The court's holding that the value of marital property as of the valuation date must include the value of a contractual right acquired after the valuation date requires considerable legal gymnastics, which includes disregarding the district court's factual findings, ignoring the valuation date, rewriting the statutory definition of "marital property," and misconstruing the purchase agreement based on scattered, isolated phrases. Therefore, I respectfully dissent.
"Our review of the trial court's conclusions in dissolution cases is limited." Olsen v. Olsen , 562 N.W.2d 797, 799-800 (Minn. 1997). "Whether property is marital or nonmarital is a question of law, but a reviewing court must defer to the [district] court's underlying findings of fact." Id. at 800. "Assigning a specific value to an asset is a finding of fact; disputes as to asset valuation are to be addressed to the trier of fact, and conflicts are to be resolved in that court." Hertz v. Hertz , 304 Minn. 144, 229 N.W.2d 42, 44 (1975). On appeal, we view the evidence in the light most favorable to the district court's findings, Borchert v. Borchert , 279 Minn. 16, 154 N.W.2d 902, 903 (1967), and we will not set aside those findings unless they are clearly erroneous, Hertz , 229 N.W.2d at 44.
At issue here is husband's 80 percent ownership interest in Wyndmere, LLC, through which he held an indirect ownership interest in Talenti Gelato. The court explains that whether property is marital depends on timing-that is, "when the asset was acquired." There is no dispute that the interest in Wyndmere was acquired during the marriage and before husband commenced the dissolution proceeding. Consequently, husband agreed that his interest in Wyndmere was a marital asset. The dispute at trial focused primarily on the valuation of that asset.
The district court is required to "value marital assets for purposes of division between the parties as of the day of the initially scheduled prehearing settlement *309 conference." Minn. Stat. § 518.58, subd. 1 (2016). In this case, the district court set the valuation date as September 5, 2014. Wife has not challenged this valuation date on appeal. It is undisputed that the sale of Talenti closed on December 2, 2014, which was 3 months after the valuation date. As required by Minn. Stat. § 518.58, subd. 1, the district court correctly determined that the "relevant factor" in valuing the parties' interest in Wyndmere is "the value of Talenti as of the valuation date ." (Emphasis added.)
The district court's valuation of Talenti was based on the price that Unilever paid for Talenti. According to the district court, "Unilever paid $180 million in cash to acquire 100% ownership interest of Talenti" in the transaction; "Unilever also agreed to pay potential earnouts for 2015 and 2016, contingent on Talenti meeting certain future sales targets." After evaluating the testimony of the witnesses involved in Talenti's operations, as well as the documentation of the transaction, the district court found that the $180 million figure represented "the present value of the business" as of the valuation date. The district court found that Unilever, which was the only "actual strategic buyer available" for Talenti, "wanted to buy the company for what it was reasonably valued at in 2014," which was $180 million. According to the district court, Unilever was not willing to "buy the company for more on the hope that Talenti would be significantly bigger in the future." The court misconstrues the facts and our standard of review by suggesting that the true value of Talenti was actually $350 million and that the $180 million sale price merely represented "an up-front payment."[1] The district court specifically found that "Talenti was sold in whole on December 2, 2014, for $180 million."
Husband has not disputed that his interest in Talenti was a marital asset and that wife was entitled to receive one-half of his share of the $180 million sale price. Wife received over $27 million for her marital share of Talenti, as well as her share of the parties' other marital assets. The district court found that "the evidence reflects that Wife received full marital value for Talenti as of the date of valuation."
The district court declined to consider the future, contingent earn-out payments in determining the value of Talenti as of the valuation date. After addressing the numerous risks, impediments, and possible setbacks that Talenti faced following the sale, the district court found that there was "a great deal of uncertainty with respect to whether the earnouts will be obtained." The district court also found that the earn-out payments, if obtained, would represent the financial "reward" for the intense efforts that would be required to demonstrate that Talenti "could grow much larger" and become "a significantly more valuable company than the one [Unilever] acquired in 2014." According to the district court, husband would be "the key, *310 integral person to Talenti continuing to grow"-"the lynchpin to Talenti moving forward." Because the earn-out payments, if obtained, would be the result of husband's "significant, post-marital labor," the district court found that the earn-out payments "represent compensation for the value added to Talenti by Husband post-valuation date." Although the court stresses that husband "received separate consideration and compensation for his post-sale, and post-dissolution, work in his employment agreement with Unilever," the district court found that his salary was "not the equivalent of the value of his employment services to Unilever."
The court frames the issue here in terms of whether the right to receive "future, contingent earn-out payments" under the purchase agreement constitutes "marital or nonmarital property" under Minn. Stat. § 518.003, subd. 3b (2016). The Legislature has defined "marital property" as property that is acquired by either spouse "at any time during the existence of the marriage" but "prior to the date of valuation." Minn. Stat. § 518.003, subd. 3b. In contrast, "nonmarital property" includes property that is "acquired by a spouse after the valuation date." Id. , subd. 3b(d).
The court's analysis focuses on the "right to receive" the earn-out payments under the purchase agreement. We have held that, at a minimum, a spouse needs to acquire the "right to receive" the property during the marriage and before the valuation date in order for a property interest to be classified as marital property. Rohling v. Rohling , 379 N.W.2d 519, 522 (Minn. 1986). Further, the right to receive property must become "more than a mere expectancy"-in other words, a "contractual right"-prior to the valuation date. Janssen v. Janssen , 331 N.W.2d 752, 754 (Minn. 1983). Therefore, even presuming that a right to receive uncertain, future, contingent earn-out payments qualifies as "property" under the dissolution statutes, a dubious proposition at best, the purchase agreement could not possibly have created any "contractual right" to the earn-out payments until, at the earliest, December 2, 2014, when the sale of Talenti closed, which was 3 months after the valuation date. Consequently, the district court made the straightforward, unassailable determination that the earn-out payments are nonmarital property because, among other reasons, any right to receive the earn-out payments was property "acquired by a spouse after the valuation date." See Minn. Stat. § 518.003, subd. 3b(d) (defining "nonmarital property"). Although the court recognizes that "whether property is marital or nonmarital" depends on whether the property was acquired before the valuation date, it ignores the valuation date by holding that wife acquired a marital interest in a right under a contract that did not exist on the valuation date.[2]
The court does not dispute that any right to the contingent earn-out payments was a right acquired after the valuation date, but the court nonetheless concludes that the earnout payments constitute marital property because the right to receive those payments derived from "the pre-dissolution sale of a marital asset." But the court's creation of a new rule, intended to "ensure the equitable division" of marital assets, is unnecessary and overreaching.
*311 Under Minn. Stat. § 518.58, subd. 1, the district court already has discretion to "adjust the valuation" of a marital asset to reflect any "substantial change" in the value of the asset after the valuation date in order "to effect an equitable distribution" of the asset, as well as discretion to "make a just and equitable division of the marital property" between the parties.[3] Thus, the court is not "merely applying the existing statutes," as it contends; rather, the court is adopting a new hard and fast extra-textual rule-that all proceeds from the sale of marital property before dissolution constitute marital property as a matter of law-regardless of whether this produces an equitable result. See Staab v. Diocese of St. Cloud , 853 N.W.2d 713, 721 (Minn. 2014) (stating that we cannot add words to a statute that is "silent on the issue in question").
Here, the district court did exactly what it was required to do under Minn. Stat. § 518.58, subd. 1 : value the marital asset "for purposes of division between the parties as of the valuation date." Under our deferential standard of review, there is no credible argument that the district court's $180 million valuation of Talenti as of the valuation date is clearly erroneous. See Maurer v. Maurer , 623 N.W.2d 604, 606 (Minn. 2001) (affording "broad deference" to the district court's valuation of an asset "because 'valuation is necessarily an approximation in many cases' " (citation omitted) ). The district court expressly found that the "$180 million sale price" fell "within an expected industry range with prices paid for other companies in comparable situations." Cf. Hertz , 229 N.W.2d at 44 (explaining that the district court's valuation of an asset need fall only "within a reasonable range of figures"). The court cannot simply substitute its own findings on value-basically, that the earn-out payments were a component of Talenti's value-for the district court's findings on value. "Respect must be paid to the applicable standard of review." Gjovik v. Strope , 401 N.W.2d 664, 668 (Minn. 1987) (stating that an appellate court "should not substitute its findings for that of the [district] court merely because it feels that the case was wrongly decided").
In addition to disregarding the district court's valuation of Talenti, the court ignores the district court's valuation date, which is the dispositive date for classifying assets under Minn. Stat. § 518.003, subd. 3b, and valuing marital assets under Minn. Stat. § 518.58, subd. 1. Under the plain language of Minn. Stat. § 518.003, subd. 3b, property acquired "during the existence of the marriage"-that is, before the date of dissolution-is marital property only if the property was acquired "prior to the date of valuation." The court acknowledges that the district court made "findings of fact related to the timing of the sale (after the valuation date)," but then the court makes the valuation date irrelevant, explaining that "the issue here is whether the right to [the earn-out] payments was received during the marriage ." (Emphasis added.) According to the court, as long as the purchase agreement was signed "before dissolution," any rights acquired under the agreement constitute marital property "regardless of when that sale occurs."
In support of this new rule, the court notes that we have "interpreted 'marital property' expansively"; however, we cannot change the plain language of the statute and decide that the relevant timeframe for classifying marital property in section 518.003 should be "before the dissolution" rather than "prior to the date of valuation."
*312 Cf. Johnson v. Johnson , 277 N.W.2d 208, 212 (Minn. 1979) (declining to redefine marital property subject to disposition by the district court because "any statutory revision should be left to the Legislature"). Moreover, there is no need to create a new timeframe for classifying proceeds where the district court already has discretion to change the valuation date if the court finds that "another date of valuation is fair and equitable." Minn. Stat. § 518.58, subd. 1. In classifying the earn-out payments as marital property, the court effectively, sua sponte, substitutes the dissolution date for the statutory valuation date. But then, at the same time the court changes the timing in order to achieve "an equitable distribution of the earn-out payments," the court refuses to consider husband's significant efforts necessary to achieve the earn-out payments, concluding that the only relevant classification factors "relate to timing."[4]
Finally, even presuming that we can create our own valuation date out of thin air for the purpose of classifying an asset in a dissolution proceeding, the court errs by holding that being "eligible to receive" uncertain, future, contingent earn-out payments under the purchase agreement is a contractual right that should be treated as marital property. The "cardinal purpose" of contract construction "is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract." Art Goebel, Inc. v. N. Suburban Agencies, Inc. , 567 N.W.2d 511, 515 (Minn. 1997). Although the interpretation of an unambiguous contract presents a question of law, Brookfield Trade Ctr., Inc. v. Cty. of Ramsey , 584 N.W.2d 390, 394 (Minn. 1998), the interpretation of an ambiguous contract presents a question of fact, Denelsbeck v. Wells Fargo & Co. , 666 N.W.2d 339, 346 (Minn. 2003). Contract language is "ambiguous if it is subject to more than one reasonable interpretation." Bus. Bank v. Hanson , 769 N.W.2d 285, 288 (Minn. 2009).
As an initial matter, I observe that there is a substantial question about whether husband's eligibility to receive uncertain, future, contingent earn-out payments under the purchase agreement should be treated as "property" under the dissolution statutes. See Minn. Stat. § 518.003, subd. 3b (" 'Marital property' means property , real or personal...." (emphasis added) ). The purchase agreement provides that, in addition to the $180 million payment, the members would be "eligible to receive " earn-out payments in 2016 and 2017 if Talenti met certain sales goals. (Emphasis added.) The district court described the *313 earn-out payments as highly uncertain, given that "[t]he company would have to grow net sales at an annual rate of about 35 percent when the industry average was around two percent." In fact, the court candidly admits that "the value" of the earn-out payments could be "$0." Therefore, even if husband's eligibility to receive earn-out payments had arisen before the valuation date, it is difficult to view the uncertain, future, contingent earn-out payments whose value could be $0 as anything other than "a mere expectancy." Janssen , 331 N.W.2d at 754.
In any event, the court errs by concluding that, based on isolated language in the purchase agreement, the earn-out payments are marital property. One provision describes the eligibility to receive earn-out payments as "additional consideration," and a distribution clause states that members would have the "right to receive" a share of the contingent earnout payments. Relying on these provisions, the court concludes that the "plain language" of the purchase agreement unambiguously shows that the uncertain, future, contingent earn-out payments are "part of the purchase price" and not compensation for husband's postmarital work.
The court's focus on scattered references in the purchase agreement to conclude, as a matter of law, that the earn-out payments are part of the purchase price is far too simplistic and inconsistent with our historic approach to contract construction. The determination of whether a contract is ambiguous "depends, not upon words or phrases read in isolation, but rather upon the meaning assigned to the words or phrases in accordance with the apparent purpose of the contract as a whole." Art Goebel, Inc ., 567 N.W.2d at 515. Words and phrases cannot be read "out of context with the entire agreement." Metro Office Parks Co. v. Control Data Corp. , 295 Minn. 348, 205 N.W.2d 121, 124 (1973). In addition, the purchase agreement must be read together with husband's employment agreement because they are part of the same transaction. The parties labeled execution of the employment agreements with members of the management team as a "condition" to the "willingness" of the buyers to enter into the purchase agreement. "It is well established that [ ] contracts relating to the same transaction ... will be read together and each will be construed with reference to the other." Anchor Cas. Co. v. Bird Island Produce, Inc. , 249 Minn. 137, 82 N.W.2d 48, 54 (1957).
In this case, the transaction was complicated, and the treatment of the earn-out payments is not simple. Reading the purchase agreement together with husband's employment agreement and reading those agreements as a whole, I conclude that the purchase agreement is, at the very least, ambiguous with respect to whether the parties intended the earn-out payments to be part of the purchase price or employee compensation. To begin with, the district court found that "[t]he deal constituted an agreement by Unilever to purchase 100% of Talenti for a total of $180 million at closing"-not $350 million, as the court suggests. In fact, the district court found that the transaction almost collapsed at "the final meeting" when one of Talenti's owners tried to "negotiate for more than $180 million as the present value of the business." See supra at D-3, n.1.
Further, for accounting purposes, earn-out payments can be treated as either part of the purchase price or as employee compensation. See generally Kimberly S. Blanchard, The Taxman Cometh: Handling Earn-Outs in Business Acquisitions , Bus. L. Today, May/June 1997, at 59-60. The characterization depends "on the facts and circumstances." Id. at 60. The substance of the arrangement here is not clear from the language of the contract. While some factors admittedly favor treating the *314 earn-out payments as part of the purchase price, a number of other factors favor treating the earn-out payments as compensation for husband's postmarital services to Talenti. For example, the district court found that husband's salary did not represent "the value of his employment services" under his employment agreement, the duration of husband's employment agreement matched the earn-out periods, and husband agreed to a covenant not to compete. See id. at 60-61. And even in situations where earn-out payments are tied to financial targets, which can suggest that they are not compensatory, "the question arises whether the achievement of the targets would likely be possible without the seller's continued services." Id. at 61. In this case, the district court specifically found that "the entire prospect of hitting the earnout targets" was contingent on husband's "significant" postmarital services.
Accordingly, under these circumstances, where the transaction is complex and the contract language is not clear, the court must defer to the findings of the district court, which found that the earn-out payments, if obtained, would "represent compensation for the value added to Talenti by Husband post-valuation date." The district court acknowledged that the passive investors in Talenti would also "reap a pro rata benefit from the earnouts," but characterized that as "a decision that [the members] agreed to amongst themselves." And the district court "did not find dispositive the fact that the Talenti tax documents referred to the complicated agreements as an 'installment sale.' " As support for its decision, the district court cited one of our prior dissolution decisions involving the valuation of the husband's interest in an engineering services company, which held that the "property acquired during marriage should be limited to that portion of the value of [the company] that is not dependent upon [the husband's] continued services." Rogers v. Rogers , 296 N.W.2d 849, 853 (Minn. 1980).
Because the language in the purchase agreement is ambiguous, we cannot reject the findings of the district court unless they are clearly erroneous. See Trondson v. Janikula , 458 N.W.2d 679, 682 (Minn. 1990). The court does not contend that the findings are clearly erroneous. Instead, the court simply disregards as irrelevant the district court's findings, including the finding that the opportunity to obtain the earn-out payments was intended to compensate husband for his "significant post-marital labor," which would be needed to "grow the company beyond its value at the time of sale"-that is, "nonmarital effort"-taking place after the dissolution of the marriage.
For all of these reasons, the court errs in overturning the decision of the district court and in classifying the uncertain, future, contingent earn-out payments as marital property, which must be divided between husband and wife, even though the district court, after a thorough and thoughtful consideration of the evidence, found that those payments, if earned, would be the result of husband's "intense post-marital efforts." The court contends that I have "incorrectly focus[ed] on valuation rather than classification," but it is the court that misclassifies a contractual right acquired after the valuation date as marital property. I simply conclude that the district court's valuation of the marital asset, as of the valuation date, is not clearly erroneous. Therefore, I would reverse the court of appeals and reinstate the decision of the district court.
I join in the dissent of Justice Anderson.

According to the district court, "[a]fter months of stop-and-start negotiations, the parties reached a handshake agreement for the sale of the company in June 2014," which "constituted an agreement by Unilever to purchase 100% of Talenti for a total of $180 million at closing," with "the potential for two unknown and contingent payouts." Additionally, Unilever had agreed to the June 2014 meeting "on the understanding that Talenti was not going to try to negotiate for more than $180 million as the present value of the business"; further, Talenti needed to "avoid[ ] alienating the only logical acquisition option" it had. The district court found that the June 2014 "meeting nearly broke down early on" when one of Talenti's owners "made a comment suggesting he believed the $180 million figure should be open to continued consideration in spite of the understanding that the sale price was no longer negotiable."

The court compares the present dispute to Janssen , where we held that "a nonvested, unmatured pension right" was marital property, even though the ultimate value of those benefits depended on postmarital labor. See 331 N.W.2d at 754. The distinction here is that the right to any earn-out payments was not "acquired" until after the valuation date because the contract setting forth the eligibility for the earn-out payments did not exist as of the valuation date; therefore, any contractual right to those payments fell outside the definition of "marital property" in Minn. Stat. § 518.003, subd. 3b.

The district court even has discretion, when necessary, to award a portion of the nonmarital property of one spouse to the other spouse to avoid "an unfair hardship." Minn. Stat. § 518.58, subd. 2.

Even during the time period in Minnesota when marital property included all property acquired "during the existence of the marriage," without specifying "prior to the date of valuation," Minn. Stat. § 518.54, subd. 5 (1980)-the same timeframe the court adopts here-we directly encouraged district courts "to consider, as one of many equitable factors, that an asset may have been acquired by one spouse without contribution of the other after commencement of a dissolution proceeding," Johnson , 277 N.W.2d at 212. Johnson was decided under a statutory scheme that subjected all property acquired during the marriage to disposition by the district court, Minn. Stat. § 518.58 (1976), in contrast to the current statute, which defines property acquired during the marriage, but after the valuation date, as nonmarital property, Minn. Stat. § 518.003, subd. 3b. Although the court essentially revives a decades-old statutory scheme, it refuses to consider the equitable factors that courts used at that time to decide issues of property disposition. See, e.g. , Johnson , 277 N.W.2d at 212 (noting that the district court "expressly considered the efforts expended by appellant in acquiring the Arizona property subsequent to commencement of the dissolution proceeding and awarded appellant the entire interest in that property"); Silverness v. Silverness , 270 Minn. 564, 134 N.W.2d 901, 905 (1965) (concluding that the trial court did not abuse its discretion by awarding to husband real property that he had acquired independently during their informal separation).